**Darwin Overson, ISB #5887**
**Eric B. Swartz, ISB #6396**
**JONES & SWARTZ** PLLC
1673 W. Shoreline Drive, Suite 200 [83702]
Post Office Box 7808
Boise, Idaho  83707-708
Telephone:  (208) 489-8989
Facsimile:  (208) 489-8988
E-mail:  darwin@jonesandswartzlaw.com
        eric@jonesandswartzlaw.com

**Attorneys for Plaintiff, Ronald Wood**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RONALD WOOD, an individual,<br><br>                    Plaintiff,<br><br>vs.<br><br>KINETIC SYSTEMS, INC., a California corporation,<br><br>                    Defendant. | Case No. 1:09-cv-00579-CWD<br><br>**ERRATA RE: DECLARATION OF COUNSEL IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO STRIKE [DN 43-1]** |

Please take notice that the relevant excerpts of the June 29, 2010 Deposition of Ronald Wood attached as Exhibit A to the Declaration of Counsel in Support of Plaintiff's Opposition to Defendant's Motion to Strike [DN 43-1], electronically filed with this Court and served on opposing counsel on December 20, 2010, inadvertently omitted a number of excerpts referenced in Plaintiff's Opposition to Defendant's Motion to Strike [DN 43].

The Court and counsel are requested to replace the Declaration of Counsel in Support of Plaintiff's Opposition to Defendant's Motion to Strike [DN 43-1] in its entirety with the copy of said Declaration attached hereto.

DATED this 27th day of December, 2010.

JONES & SWARTZ PLLC

By    /s/ Darwin L. Overson            
                DARWIN L. OVERSON
                ERIC B. SWARTZ

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 27th day of December, 2010, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent a Notice of Electronic Filing to the following persons:

Fredric V. Shoemaker
Thomas J. Lloyd
GREENER BURKE SHOEMAKER, P.A.
950 W. Bannock Street, Suite 900
Boise, ID 83702

H. Ann Liroff
Steven M. Cvitanovic
HAIGHT BROWN & BONESTEEL, LLP
71 Stevenson Street, 20th Floor
San Francisco, CA 94105

           /s/ Darwin L. Overson         
                DARWIN L. OVERSON
                ERIC B. SWARTZ

Darwin Overson, ISB #5887
Eric B. Swartz, ISB #6396
**JONES & SWARTZ** PLLC
1673 W. Shoreline Drive, Suite 200 [83702]
Post Office Box 7808
Boise, Idaho 83707-708
Telephone: (208) 489-8989
Facsimile: (208) 489-8988
E-mail: darwin@jonesandswartzlaw.com
        eric@jonesandswartzlaw.com

**Attorneys for Plaintiff, Ronald Wood**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RONALD WOOD, an individual,<br><br>          Plaintiff,<br><br>vs.<br><br>KINETIC SYSTEMS, INC., a California corporation,<br><br>          Defendant. | Case No. 1:09-cv-00579-CWD<br><br>**DECLARATION OF COUNSEL IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO STRIKE [40-1]** |

STATE OF IDAHO    )
                 : ss.
County of Ada       )

      I, DARWIN OVERSON, being first duly sworn upon oath, depose and state as following of my own personal knowledge:

      1.      I am counsel of record for the Plaintiff in the above-entitled lawsuit.

      2.      I am over the age of 18 years and fully competent to testify to the statements made herein should I be called to testify.

      3.      Attached hereto as Exhibit A is a true and correct copy of relevant excerpts of the

*DECLARATION OF COUNSEL IN SUPPORT OF PLAINTIFF'S OPPOSITION TO*
*DEFENDANT'S MOTION TO STRIKE [40-1]*– 1

Deposition of Ronald Wood, taken on June 29, 2010 along with Exhibits 1, 3 and 12 thereto.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

DARWIN OVERSON

SUBSCRIBED AND SWORN TO before me this _20th_ day of December, 2010.

Notary Public for Idaho
My Commission Expires: _1.8.12_

*DECLARATION OF COUNSEL IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO STRIKE [40-1] – 2*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of December, 2010, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent a Notice of Electronic Filing to the following persons:

        Fredric V. Shoemaker
        Thomas J. Lloyd
        GREENER BURKE SHOEMAKER, P.A.
        950 W. Bannock Street, Suite 900
        Boise, ID 83702

        H. Ann Liroff
        Steven M. Cvitanovic
        HAIGHT BROWN & BONESTEEL, LLP
        71 Stevenson Street, 20th Floor
        San Francisco, CA 94105

                        DARWIN L. OVERSON
                        ERIC B. SWARTZ

EXHIBIT A
to Declaration of Counsel In Support of Plaintiff's
Opposition to Defendant's Motion to Strike [40-1]

EXHIBIT A
to Declaration of Counsel In Support of Plaintiff's
Opposition to Defendant's Motion to Strike [40-1]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


RONALD WOOD, an individual,      )

                Plaintiff,      )

vs.                              )

KINETIC SYSTEMS, INC., a         )  Case No.

California corporation,          )  1:09-CV-00579-CWD

                Defendant.      )

_____  )


VIDEOTAPED DEPOSITION OF RONALD WOOD

JUNE 29, 2010


REPORTED BY:


BEVERLY A. BENJAMIN, CSR No. 710, RPR


Notary Public

b080e889-f0e3-4773-aac9-16a448e45d2e

Page 2

1    THE VIDEOTAPED DEPOSITION OF RONALD WOOD
2  was taken on behalf of the Defendant at the
3  offices of Greener Burke Shoemaker, PA, 950
4  W. Bannock Street, Suite 900, Boise, Idaho,
5  commencing at 9:21 a.m. on June 29, 2010, before
6  Beverly A. Benjamin, Certified Shorthand Reporter
7  and Notary Public within and for the State of
8  Idaho, in the above-entitled matter.
9
10      A P P E A R A N C E S:
11  For the Plaintiff:
12     Jones & Swartz, PLLC
13     BY MR. DARWIN OVERSON
14     1673 W. Shoreline Drive, Suite 200
15     P.O. Box 7808
16     Boise, Idaho 83707-7808
17  For the Defendant:
18     Haight Brown & Bonesteel, LLP
19     BY MR. STEVEN M. CVITANOVIC
20     71 Stevenson Street, 20th Floor
21     San Francisco, California 94105
22  Also Present: Alexa Koontz
23  Videographer: Dan Sullivan
24
25

Page 3

1        I N D E X
2  TESTIMONY OF RONALD WOOD            PAGE
3  Examination by Mr. Cvitanovic         7
4  Examination by Mr. Overson          195
5
6        E X H I B I T S
7  NO. DESCRIPTION                    PAGE
8  1 -  E-mail from J.T. Land to Ron Wood,    22
9       1/19/98, Subject:  National
10      Microelectronics Construction
11      Superintendent
12  2 -  Letter from Chris Durand, Kinetics,   32
13      to Ronald Wood, November 4, 2003
14  3 -  E-mail chain ending in e-mail from    42
15      Ron Wood to Chris Durand, October
16      6, 2003, Subject:  Compensation
17  4 -  Position Description for branch       47
18      labor manager
19  5 -  Position Description of project       61
20      superintendent
21  6 -  Handwritten date notation       79
22  7 -  Union Time Cards            82
23  8 -  Union Time Cards and Unpaid        90
24      Overtime and Double Time summary
25      sheet

Page 4

1  9 -  Memorandum from Ron Wood, May 9,     104
2       2008, Subject:  Classification
3       Change
4  10 -  E-mail chain ending in e-mail from   111
5       Sandra Kellam to Alexa Koontz,
6       October 7, 2009, Subject:  FW:
7       PCN's
8  11 -  Personnel Change Notice       116
9  12 -  E-mail chain ending in e-mail from   123
10      Ron Wood to Alexa Koontz, May 4,
11      2007, Subject:  RE: Stew McDaniel
12  13 -  E-mail chain ending in e-mail from   125
13      Ron Wood to Sandra Kellam and Faye
14      Stephens, March 22, 2008, Subject:
15      RE:  WE 03.23.08 Time Card Needed
16      ASP!
17  14 -  Plaintiff's Rule 26(a) Initial      132
18      Disclosures
19  15 -  E-mail from Ron Wood to Alexa       162
20      Koontz and Bob Portman, 1/8/2007,
21      Subject:  Pay Policy 01-02-07, with
22      attached Pay Policy
23  16 -  Vacation, Eligibility for Vacation   180
24      Benefits
25  17 -  E-mail from Ron Wood to Alexa       182

Page 5

1       Koontz, 2/28/2008, Subject:  Labor
2       Holiday and Vacation Accrual List
3       01-01-08.xls, with attached
4       spreadsheet
5  18 -  Vacation Authorizations       184
6  19 -  Unpaid Vacation Pay        186
7  20 -  Vacation Accrual Discrepancies,     186
8       1/22/2009, from Ron Wood to Alexa,
9       with attached handwritten notations
10  21 -  Authorizations for Overtime      188
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 10

```
09:25:24  1      Q.  Alexa Koontz is here for the deposition.
09:25:28  2   I believe you've met Alexa before?
09:25:30  3      A.  Yes, I have.
09:25:32  4      Q.  And you two worked in the same office
09:25:34  5   for a period of time?
09:25:36  6      A.  Yes.
09:25:36  7      Q.  Have you ever been a plaintiff in a
09:25:40  8   lawsuit?
09:25:40  9      A.  No.
09:25:40 10      Q.  Where are you currently employed?
09:25:44 11      A.  With Southland, Southland Industries.
09:25:50 12      Q.  Where are they located?
09:25:50 13      A.  Northern California.
09:25:52 14      Q.  How long have you been with them?
09:25:58 15      A.  Since September last year.
09:26:02 16      Q.  What is your current title?
09:26:06 17      A.  Project superintendent.
09:26:08 18      Q.  Is that the title you started with?
09:26:12 19      A.  Yes.
09:26:12 20      Q.  Who do you report to?
09:26:14 21      A.  I report to Mark Williams right now.
09:26:20 22      Q.  Who is he?
09:26:22 23      A.  He is a construction manager for
09:26:26 24   Southland.
09:26:28 25      Q.  Are you a salaried employee?
```

Page 11

```
09:26:30  1      A.  No.
09:26:30  2      Q.  Hourly?
09:26:30  3      A.  Yes.
09:26:32  4      Q.  How much --
09:26:34  5      A.  Nonexempt.
09:26:34  6      Q.  Do you receive overtime?
09:26:38  7      A.  I will when I work overtime, yes.
09:26:42  8      Q.  What project are you working on right
09:26:50  9   now?
09:26:50 10      A.  Cathedral Hill Hospital.
09:26:56 11      Q.  Where is that?
09:26:56 12      A.  It's preconstruction right now, which is
09:27:00 13   design and coordination.  It is at 633 Folsom in
09:27:06 14   San Francisco.
09:27:06 15      Q.  Do you still currently reside in Idaho
09:27:22 16   when you are not working?
09:27:22 17      A.  Yes.
09:27:24 18      Q.  What is your residential address?
09:27:26 19      A.  74 South Robinson Road, Nampa, Idaho.
09:27:34 20      Q.  Sorry, I interrupted you.
09:27:38 21         That leads me to one admonition I forgot
09:27:42 22   to give you.  It's important for you to let me
09:27:44 23   finish my question before you begin your
09:27:48 24   response, sometimes I will trail off.  And I will
09:27:52 25   also try and wait for you to finish your response
```

Page 12

```
09:27:54  1   before I ask my next question.  It's just the
09:27:58  2   transcript which we prepare will look somewhat
09:28:02  3   choppy if we are talking over one another.  So I
09:28:04  4   wanted to say that.
09:28:06  5         What is your highest level of education?
09:28:12  6      A.  Twelfth grade, high school, plus five
09:28:18  7   years of apprenticeship in the local union, pipe
09:28:28  8   fitter.
09:28:28  9      Q.  When did you apprentice with the union?
09:28:32 10      A.  1978.
09:28:34 11      Q.  To when?
09:28:36 12      A.  I believe I turned out in '83.
09:28:46 13      Q.  When you were apprenticing, was that
09:28:52 14   local work here?
09:28:54 15      A.  Yes, within the jurisdiction of Local
09:28:58 16   296.
09:29:00 17      Q.  What position or trade or craft were you
09:29:10 18   learning as an apprentice specifically?
09:29:12 19      A.  Pipe fitting and plumbing.
09:29:18 20      Q.  Could you give me the names of the
09:29:26 21   unions again that you remember, the local branch
09:29:32 22   of which union.
09:29:32 23      A.  Local 296.
09:29:34 24      Q.  Which is the Idaho --
09:29:36 25      A.  Plumbers and pipe fitters.
```

Page 13

```
09:29:42  1      Q.  Are you a member of any other union?
09:29:44  2      A.  No, sir.
09:29:44  3      Q.  You've been a member of that union since
09:29:48  4   1978?
09:29:48  5      A.  Yes, sir.
09:29:50  6      Q.  When did you begin working with Kinetic
09:29:56  7   Systems?
09:29:56  8      A.  1988.
09:30:04  9      Q.  You were a journeyman by then?
09:30:08 10      A.  Yes.
09:30:08 11      Q.  Journeyman pipe fitter?
09:30:12 12      A.  Yes.
09:30:12 13      Q.  How long did you remain in that position
09:30:24 14   as a pipe fitter, journeyman pipe fitter, with
09:30:30 15   Kinetic Systems?  What I want to know is, when
09:30:32 16   did your status change when you began doing some
09:30:36 17   other job for Kinetic Systems?
09:30:36 18      A.  I worked as a foreman on that particular
09:30:42 19   job at Micron in 1988.
09:30:48 20      Q.  Where was that job located?
09:30:50 21      A.  In Boise at Micron.
09:30:52 22      Q.  And at that point in time you were a
09:31:04 23   nonexempt employee?
09:31:06 24      A.  Yes.
09:31:06 25      Q.  Receiving overtime?
```

b080e889-f0e3-4773-aac9-16a448e45d2e

Page 14

09:31:08 1    A.  Yes.
09:31:10 2    Q.  When was your first job with Kinetic
09:31:16 3  Systems where you became, quote, unquote
09:31:20 4  "exempt"?
09:31:20 5    MR. OVERSON:  Objection to the form of
09:31:22 6  the question; it assumes facts not in evidence.
09:31:26 7  Go ahead and answer the question.
09:31:30 8    THE WITNESS:  I haven't been identified
09:31:32 9  as exempt.
09:31:40 10    Q.  (BY MR. CVITANOVIC)  You were a pipe
09:31:48 11  fitter and a foreman on the Micron project.
09:31:50 12    A.  Yes.
09:31:52 13    Q.  And that was in 1988 in Boise, Idaho.
09:31:56 14  Were you doing work with your hands at that point
09:31:58 15  even though you were a foreman?
09:32:00 16    A.  No, I was a nonworking foreman.
09:32:04 17    Q.  What was your next project
09:32:12 18  approximately?
09:32:14 19    A.  In 1990, I believe it was, I went to
09:32:18 20  work as an area superintendent for Kinetics in
09:32:30 21  Rhode Island on the WelGen project, W-e-l-G-e-n.
09:32:38 22    Q.  How long were you at that project, the
09:32:48 23  WelGen project?
09:32:50 24    A.  I believe it was April of '91.
09:32:56 25    Q.  What were your duties and

Page 15

09:33:02 1  responsibilities as the area superintendent on
09:33:04 2  the WelGen project?
09:33:06 3    A.  To organize work packages, prioritize
09:33:14 4  fabrication, and direct crews for installation.
09:33:22 5    Q.  How were you compensated?  Were you
09:33:26 6  compensated by the hour or were you a salaried
09:33:28 7  employee?
09:33:28 8    A.  By the hour.
09:33:30 9    Q.  Would you submit overtime requests?
09:33:36 10    A.  Yes.
09:33:36 11    Q.  Were they paid?
09:33:38 12    A.  Yes.
09:33:38 13    Q.  What was the next job that you would --
09:33:56 14  was the area superintendent, did you consider
09:34:00 15  that a promotion over the foreman job?
09:34:04 16    A.  Yes.
09:34:04 17    Q.  What was the next time you considered
09:34:08 18  that you received a promotion within Kinetic
09:34:10 19  Systems?
09:34:10 20    A.  When I went to work in Boulder, Colorado
09:34:18 21  as a project superintendent.
09:34:20 22    Q.  When was that?
09:34:22 23    A.  That was probably '92.
09:34:26 24    Q.  Quick question:  Between 1988 and your
09:34:38 25  termination from Kinetic Systems in 2009, did you

Page 16

09:34:44 1  work continuously for Kinetic Systems?
09:34:46 2    A.  I was laid off from, I believe it was
09:34:52 3  June of '89 until January of 1990.
09:34:56 4    Q.  So other than that brief layoff period
09:35:06 5  there was continuous employment between 1988 to
09:35:10 6  2009?
09:35:10 7    A.  Between 1990 -- I was laid off between
09:35:14 8  1988 and 1990.  It was continuous employment from
09:35:20 9  1990 to 2009.
09:35:28 10    Q.  In '92 you were the project
09:35:34 11  superintendent in Boulder, Colorado?
09:35:34 12    A.  Yes.
09:35:36 13    Q.  What project was that?
09:35:38 14    A.  Synergen.
09:35:40 15    Q.  Pardon me?
09:35:40 16    A.  Synergen.
09:35:40 17    Q.  Could you spell that?
09:35:44 18    A.  S-y-n-e-r-g-e-n.
09:35:44 19    Q.  Excellent.  Thank you.
09:35:50 20    How were you compensated, by the hour or
09:35:52 21  were you a salaried employee?
09:35:54 22    A.  By the hour.
09:35:56 23    Q.  Did you submit overtime?
09:35:56 24    A.  Yes.
09:35:58 25    Q.  Was your overtime paid?

Page 17

09:35:58 1    A.  Yes.
09:35:58 2    Q.  What was the next project that you went
09:36:10 3  to work for where you considered yourself to
09:36:16 4  receive a promotion?
09:36:16 5    A.  I don't know that it would be a
09:36:20 6  promotion, but I went to Roseville, California.
09:36:26 7    Q.  In what year?
09:36:26 8    A.  I believe that was '93, working on a
09:36:36 9  construction management role as an MEP
09:36:42 10  coordinator.
09:36:42 11    Q.  As an MEP coordinator?
09:36:44 12    A.  Yes.
09:36:46 13    Q.  How were you compensated; by the hour or
09:36:52 14  salary?
09:36:54 15    A.  By the hour.
09:36:54 16    Q.  Did you submit overtime requests?
09:36:56 17    A.  Yes.
09:36:58 18    Q.  Were they paid?
09:36:58 19    A.  Yes.
09:36:58 20    Q.  What about after that, after the
09:37:08 21  Roseville project?
09:37:08 22    MR. OVERSON:  Objection to the form of
09:37:10 23  the question.
09:37:24 24    Q.  (BY MR. CVITANOVIC)  What was your next
09:37:14 25  employment within Kinetics after the Roseville

b080e889-f0e3-4773-aac9-16a448e45d2e

Page 22

```
09:43:12  1   eligible for overtime; right?
09:43:12  2        A.  No.
09:43:12  3        Q.  That was not your understanding?
09:43:14  4        A.  No.
09:43:14  5        Q.  So then what was your understanding,
09:43:18  6   that you were eligible for overtime?
09:43:18  7        A.  Yes.
09:43:20  8        Q.  But you just didn't bill it?
09:43:22  9        A.  I didn't work it.
09:43:22 10        Q.  You didn't work it.
09:43:42 11             MR. CVITANOVIC:  I'm going to show you a
09:43:46 12   document from Mr. Land here.  Mark that if you
09:43:46 13   would.
09:43:46 14             MR. OVERSON:  This is Exhibit 1?
09:43:48 15             MR. CVITANOVIC:  Exhibit 1.
09:43:48 16             (Exhibit 1 marked.)
09:44:32 17             MR. OVERSON:  Ron, take your time to
09:44:32 18   review the entire document.  He's going to ask
09:44:32 19   you questions.
09:45:08 20             THE WITNESS:  (Reviewing document.)
09:45:08 21        Q.  (BY MR. CVITANOVIC)  I'm only going to
09:45:10 22   ask you about paragraphs 1 and 2, but if you want
09:45:14 23   to review the whole document, be my guest.  Just
09:45:16 24   let me know when you are ready.
09:45:18 25        A.  (Reviewing document.)  Okay.
```

Page 23

```
09:45:54  1        Q.  Keep the document.  I'm going to ask you
09:45:58  2   some questions about it.
09:46:04  3        You've heard of the term "exempt
09:46:06  4   employee"; correct?
09:46:06  5        A.  Yes.
09:46:06  6        Q.  You've used that term yourself?
09:46:08  7        A.  Yes.
09:46:08  8        Q.  And I'm not looking for legal
09:46:12  9   definitions of what an exempt employee is.  I
09:46:16 10   just want to focus on conversations where that
09:46:20 11   term was used, all right.  So I'm not asking for
09:46:24 12   anybody to go to hornbook or a statute or the
09:46:28 13   Fair Labor Standards Act to define what an exempt
09:46:32 14   employee is.  I just want to know what people
09:46:34 15   said, what they heard, and what they wrote.
09:46:36 16   Okay?
09:46:36 17        A.  Yes.
09:46:36 18        Q.  So that is what I mean.  I say that
09:46:38 19   partly for your counsel as well.
09:46:42 20        The second sentence of paragraph 1 says
09:46:46 21   that:  "You will be a salaried exempt employee."
09:46:50 22   Do you see that?
09:46:50 23        A.  Yes.
09:46:50 24        Q.  Earlier I asked you when you first
09:46:54 25   became an exempt employee at Kinetic Systems and
```

Page 24

```
09:46:56  1   you denied ever being an exempt employee.  Did I
09:47:00  2   understand your response to my question correctly
09:47:04  3   where you denied being an exempt employee?
09:47:06  4        A.  You understand my response correctly.
09:47:10  5        Q.  Did you ever respond to Tom's e-mail in
09:47:14  6   writing or on the phone saying to him I don't
09:47:16  7   know what you are talking about, I don't know
09:47:18  8   what an exempt employee is, or I disagree with
09:47:22  9   you, I am a nonexempt employee?  In other words,
09:47:26 10   did you ever dispute his contention that you were
09:47:28 11   an exempt employee?
09:47:28 12        A.  I don't believe so.
09:47:30 13        Q.  Did you ever dispute the part right
09:47:36 14   after that where it says no --
09:47:38 15             MR. OVERSON:  I'm sorry, I need to
09:47:38 16   interjection an objection here.  There is a
09:47:48 17   foundational objection as well as the form of the
09:47:50 18   question.  I don't know that we've established
09:47:56 19   what this is.
09:47:58 20             MR. CVITANOVIC:  Well, your objection is
09:48:02 21   noted.  It's an e-mail from --
09:48:04 22             MR. OVERSON:  You are making that
09:48:06 23   representation?
09:48:06 24             MR. CVITANOVIC:  I'm making a
09:48:08 25   representation that this document appears to be
```

Page 25

```
09:48:10  1   an e-mail and it says to Ron Wood from Tom Land.
09:48:20  2        Q.  (BY MR. CVITANOVIC)  You would receive
09:48:22  3   e-mails from Tom Land, would you not?
09:48:22  4        A.  Yes.
09:48:24  5        Q.  Do you dispute ever receiving this
09:48:26  6   e-mail?
09:48:28  7        A.  I don't dispute it.  I don't remember
09:48:32  8   it.
09:48:32  9        Q.  Continuing on with my questions then,
09:48:40 10   where it says "no overtime."  Do you see that?
09:48:44 11        A.  Yes.
09:48:44 12        Q.  You told me that you were entitled to
09:48:46 13   overtime.  Did you ever say to Tom Land either in
09:48:50 14   a reply e-mail or in a letter or any other way in
09:48:54 15   writing or verbally that you were entitled to
09:48:58 16   overtime?
09:48:58 17             MR. OVERSON:  Objection; assumes facts
09:49:02 18   not in evidence, form of the question.  Go ahead
09:49:04 19   and answer the question.
09:49:06 20             THE WITNESS:  I don't believe I ever did
09:49:06 21   respond to Tom my misunderstanding.  I don't
09:49:14 22   believe I ever did respond to Tom Land stating
09:49:18 23   that I would be eligible, that I should be
09:49:22 24   nonexempt.
09:49:28 25        Q.  (BY MR. CVITANOVIC)  So I understand
```

(208)345-9611      M & M COURT REPORTING (208)345-8800 (fax)

b080e889-f0e3-4773-aac9-16a448e45d2e

Page 26

09:49:30 1    what you are saying, you don't ever recall
09:49:32 2    responding to Tom Land that you believe you were
09:49:36 3    nonexempt.
09:49:36 4        A.   Correct.
09:49:36 5        Q.   You don't ever recall responding to Tom
09:49:40 6    Land that you believe you are entitled to
09:49:42 7    overtime.
09:49:44 8        A.   Correct.
09:49:44 9        Q.   How long were you a construction
09:49:56 10   superintendent?
09:49:58 11       A.   I believe about a year.
09:50:00 12       Q.   And in that year as construction
09:50:06 13   superintendent you never worked any overtime?
09:50:12 14       A.   Not that I can recall, no.
09:50:14 15       Q.   When you were a project superintendent
09:50:20 16   you did work overtime?
09:50:20 17       A.   Yes.
09:50:22 18       Q.   You were paid for all your overtime?
09:50:24 19       A.   Yes.
09:50:24 20       Q.   Then when you became a construction
09:50:26 21   superintendent was it less work?
09:50:26 22       A.   No.
09:50:28 23       Q.   It was --
09:50:28 24       A.   It was a different type of work.
09:50:30 25       Q.   Was it just as much work?

Page 27

09:50:32 1        MR. OVERSON:  Objection; the question is
09:50:36 2    vague, so it would be form of the question.
09:50:40 3        Go ahead and answer if you understand
09:50:40 4    it.
09:50:40 5        THE WITNESS:  I'm not sure I understand
09:50:42 6    the question because it's different types of
09:50:44 7    work.  One isn't any more difficult than another.
09:50:48 8        Q.   (BY MR. CVITANOVIC)  Would you
09:50:50 9    frequently work more than 8 hours a day?
09:50:52 10       A.   I don't believe so, no.
09:50:58 11       Q.   How many projects -- when you were
09:51:00 12   construction superintendent, what was the average
09:51:04 13   number of projects that you were responsible to
09:51:08 14   go visit?
09:51:12 15       MR. OVERSON:  Objection; the question is
09:51:14 16   vague and so I have a form of the question
09:51:18 17   objection on the record.
09:51:18 18       Go ahead and answer the question.
09:51:20 19       THE WITNESS:  Could be three.
09:51:22 20       Q.   (BY MR. CVITANOVIC)  Would that be three
09:51:26 21   at any given time within a month?  I'm trying to
09:51:34 22   understand your role as a construction
09:51:36 23   superintendent.  I mean, do you oversee projects;
09:51:40 24   what were you supposed to do with respect to the
09:51:42 25   projects as a construction superintendent?

Page 28

09:51:44 1        A.   Well, basically the same thing that this
09:51:48 2    letter states; I would evaluate them, I would
09:51:50 3    develop a report and I'd send it back to Tommy.
09:51:54 4        Q.   How much travel was there; quite a bit?
09:51:58 5        A.   Yes.
09:51:58 6        Q.   And what region?
09:52:04 7        A.   The US.
09:52:04 8        Q.   Was it US?
09:52:10 9        In all the time that you were a
09:52:12 10   construction superintendent, you never worked
09:52:16 11   more than 8 hours a day?
09:52:16 12       A.   Not that I can recall.
09:52:18 13       Q.   When you were a project superintendent
09:52:32 14   on average would you bill overtime almost every
09:52:34 15   day?
09:52:36 16       A.   Only when I was working overtime.
09:52:40 17       Q.   How frequently was that?
09:52:42 18       A.   Oftentimes the projects would go into
09:52:44 19   overtime, scheduled overtime, that I would bill
09:52:48 20   for.
09:52:48 21       Q.   When you were a construction
09:52:52 22   superintendent were you not billing overtime
09:52:54 23   because you knew that you were not entitled to
09:52:56 24   overtime?
09:52:56 25       A.   I was in a different type of capacity

Page 29

09:53:00 1    that didn't require my attendance on the project
09:53:02 2    to work the overtime.
09:53:04 3        Q.   But you also worked more than 8 hours a
09:53:06 4    day as a construction superintendent.
09:53:06 5        MR. OVERSON:  Objection; asked and
09:53:06 6    answered.
09:53:08 7        Q.   (BY MR. CVITANOVIC)  Isn't that true?
09:53:12 8        A.   No.
09:53:12 9        Q.   So in the entire year or so that you
09:53:16 10   were a construction superintendent you never
09:53:18 11   worked more than 8 hours a day.  I just want to
09:53:20 12   make sure I understand your testimony.
09:53:22 13       A.   As far as I can recall, 8 hours a day.
09:53:26 14       Q.   So what happened then after that year
09:53:34 15   where you were a construction superintendent?
09:53:36 16       A.   I went to work for Julian Frost.
09:53:42 17       Q.   When?
09:53:42 18       A.   I believe that was in 2000.
09:53:46 19       Q.   In what capacity?
09:53:50 20       A.   Labor manager.
09:53:52 21       Q.   For what branch or region?
09:54:00 22       A.   Central and east region.
09:54:02 23       Q.   At that point in the year 2000 those
09:54:06 24   regions were combined?
09:54:08 25       A.   Yes.

b080e889-f0e3-4773-aac9-16a448e45d2e

Page 30

```
09:54:08  1       Q.  At some point did the east region and
09:54:14  2    central region become separate regions?
09:54:18  3       A.  Yes.
09:54:18  4       Q.  Approximately when was that?
09:54:20  5       A.  I can't recollect.  It might have been
09:54:26  6    2001, 2002.
09:54:28  7       Q.  Julian Frost, was he the regional
09:54:44  8    manager?
09:54:44  9       A.  Yes.
09:54:44 10       Q.  For the central and the east?
09:54:46 11       A.  Yes.
09:54:46 12       Q.  At some point he was replaced, right, or
09:54:50 13    he left or there was --
09:54:54 14       A.  Yes.
09:54:54 15       Q.  At some point you reported to Chris
09:54:58 16    Durand.
09:54:58 17       A.  Yes.
09:54:58 18       Q.  And that was in about November 2003 with
09:55:02 19    the transfer agreement?
09:55:02 20       A.  Yes.
09:55:08 21       MR. OVERSON:  I'm sorry, what was the
09:55:08 22    name of the gentleman?
09:55:10 23       MR. CVITANOVIC:  Chris Durand,
09:55:10 24    D-u-r-a-n-d.
09:55:16 25       Q.  (BY MR. CVITANOVIC)  When you went to
```

Page 31

```
09:55:16  1    work as a labor manager, who did you negotiate
09:55:22  2    with; did you negotiate with Julian over that
09:55:26  3    promotion?
09:55:28  4       MR. OVERSON:  Objection; assumes facts
09:55:32  5    that are not in evidence, so I have a form of the
09:55:34  6    question objection.
09:55:36  7       Go ahead and answer it if you can.
09:55:36  8       THE WITNESS:  From what I recollect, it
09:55:38  9    was discussion between Tommy and Julian and the
09:55:46 10    open end of the position in the east and whether
09:55:50 11    I would support that and I said I would.
09:55:52 12       Q.  (BY MR. CVITANOVIC)  The opening of the
09:55:54 13    labor manager position in 2000.
09:55:56 14       A.  Yes.
09:55:56 15       Q.  That was a promotion, was it not?
09:55:58 16       A.  Yes.
09:55:58 17       Q.  You received an increase in salary?
09:56:08 18       A.  I can't recollect.
09:56:08 19       Q.  You worked with Tom and Julian with
09:56:24 20    respect to the terms of your promotion to labor
09:56:28 21    manager in the year 2000.
09:56:32 22       A.  Not necessarily terms, no, because there
09:56:36 23    wasn't anything in writing when I took that
09:56:38 24    position with Julian, that I can recollect.
09:56:42 25       Q.  Was the first written document with
```

Page 32

```
09:56:52  1    respect to your being a labor manager, was that
09:56:56  2    the November 4, 2003 letter that was sent by
09:57:00  3    Kinetic Systems to you?
09:57:02  4       MR. OVERSON:  Objection; form of the
09:57:04  5    question, it's vague.
09:57:06  6       Q.  (BY MR. CVITANOVIC)  You understood what
09:57:06  7    I was asking; right?
09:57:08  8       A.  Yes.  The letter, the offer letter
09:57:12  9    through Chris Durand.
09:57:14 10       Q.  That's right.
09:57:14 11       A.  Yes.
09:57:26 12       MR. CVITANOVIC:  This will be Exhibit 2.
09:57:26 13       (Exhibit 2 marked.)
09:57:50 14       MR. OVERSON:  Ron, since we're not
09:57:52 15    really doing anything right now, just pay
09:57:54 16    attention when we leave to make sure you don't
09:57:56 17    pick up the exhibits.  That is a tendency of
09:58:42 18    witnesses.  We don't want that to happen.
09:58:42 19       THE WITNESS:  (Reviewing document.)
09:58:42 20       Q.  (BY MR. CVITANOVIC)  Between when you
09:58:54 21    first became a labor manager in the central and
09:58:56 22    east region and this offer letter of November 4,
09:59:00 23    2003 that we've attached here as Exhibit 2 to
09:59:04 24    this deposition, you were a labor manager
09:59:08 25    continuously during that point in time; right?
```

Page 33

```
09:59:10  1       A.  Yes.
09:59:10  2       Q.  You were a salaried employee?
09:59:14  3       A.  No.
09:59:14  4       Q.  You were not a salaried employee?
09:59:16  5       A.  No.
09:59:16  6       Q.  How were you paid?
09:59:18  7       A.  Hourly.
09:59:18  8       Q.  So if you did not bill your time, then
09:59:32  9    you would not get paid.  In other words, because
09:59:36 10    you were an hourly employee, if you were to get
09:59:40 11    paid you had to bill your time.
09:59:42 12       A.  I had to submit time cards weekly.
09:59:46 13       Q.  And was your paycheck always the same
09:59:48 14    amount?
09:59:50 15       A.  No.
09:59:50 16       Q.  So if you only worked 5 hours a week you
09:59:54 17    would only get paid for 5 hours of your time?
09:59:56 18       A.  No.
09:59:58 19       Q.  How is that possible?  You said you were
10:00:00 20    an hourly employee.  If you worked 5 hours a week
10:00:08 21    at your rate, you wouldn't just get 5 hours times
10:00:12 22    your rate?
10:00:12 23       A.  I never billed for 5 hours a week.
10:00:14 24       Q.  As an example then, maybe that was a bad
10:00:20 25    example on my part.  But you understood that your
```

b080e889-f0e3-4773-aac9-16a448e45d2e

### Page 34

```
10:00:22  1   payment, your check at the end of every -- were
10:00:28  2   you paid every week or two weeks?
10:00:28  3       A.  Every week.
10:00:30  4       Q.  Your check at the end of every week, the
10:00:34  5   amount was solely based on how much you submitted
10:00:38  6   on your time cards?
10:00:40  7       A.  Yes.
10:00:40  8       Q.  And that amount would fluctuate; is that
10:00:44  9   what you are saying?
10:00:46 10       A.  Yes.
10:00:46 11       Q.  Are you claiming that you were entitled
10:00:54 12   to overtime during that period between 2000 and
10:00:58 13   the offer letter of November 4, 2003?
10:01:00 14       A.  Yes.
10:01:00 15       Q.  Did you bill overtime?
10:01:02 16       A.  Yes.
10:01:04 17       Q.  Did you get paid overtime?
10:01:06 18       A.  Yes.
10:01:06 19       Q.  Let's look at Exhibit 2.  This is your
10:01:28 20   signature on Exhibit 2; is that right?
10:01:30 21       A.  Yes.
10:01:30 22       Q.  And these are the basic terms of your
10:01:42 23   agreement with Kinetics to be a labor manager?
10:01:44 24       A.  In 2003, yes.
10:01:46 25       Q.  In 2003.  At this point in time.
```

### Page 35

```
10:01:50  1       A.  Yes.
10:01:50  2       Q.  Now, you were salaried, you became a
10:01:54  3   salaried employee under this agreement; right?
10:01:58  4       A.  I was paid by the hour.
10:02:02  5       Q.  Well, wasn't that only for your union
10:02:04  6   benefits?
10:02:06  7       A.  I had to submit a time card weekly
10:02:08  8   reflecting the hours that I worked.
10:02:10  9       Q.  Well, everybody had to submit a time
10:02:12 10   card, did they not?
10:02:14 11       A.  I'm not sure I understand your question.
10:02:18 12   Yes, everybody reports their hours.
10:02:22 13       Q.  So as an example, office personnel who
10:02:28 14   are in management positions, they submit time
10:02:30 15   cards as well; right?
10:02:32 16       A.  I believe so, yes.
10:02:32 17       Q.  And they submit time cards even though
10:02:38 18   they are salaried employees; true?
10:02:38 19       MR. OVERSON:  Objection; I think the
10:02:40 20   question calls for speculation.  Go ahead and
10:02:42 21   answer.
10:02:42 22       Q.  (BY MR. CVITANOVIC)  You were in that
10:02:42 23   office, the Durham office.
10:02:42 24       A.  Yes.
10:02:44 25       Q.  You knew that the salaried management
```

### Page 36

```
10:02:48  1   employees in that office, they submitted time
10:02:52  2   cards?
10:02:52  3       A.  I knew they was reporting their time
10:02:56  4   biweekly, yes.
10:03:02  5       Q.  And the 62.50 per hour that is on
10:03:02  6   Exhibit 2, that was for your union benefits;
10:03:06  7   isn't that correct?
10:03:08  8       MR. OVERSON:  Objection; form of the
10:03:09  9   question.
10:03:12 10       THE WITNESS:  I don't know that that was
10:03:14 11   the sole reason that this was set up this way was
10:03:18 12   for union benefits, no.
10:03:18 13       Q.  (BY MR. CVITANOVIC)  So you are telling
10:03:22 14   me that your paycheck differed, after this
10:03:24 15   November 2nd agreement, your paycheck differed on
10:03:28 16   a weekly basis depending on how much time you
10:03:32 17   billed?
10:03:32 18       A.  No.
10:03:34 19       Q.  Then what are you telling me?
10:03:36 20       A.  As a labor manager I reported 40 hours a
10:03:38 21   week.
10:03:42 22       Q.  All right.  So your paycheck was always
10:03:46 23   the same?
10:03:46 24       A.  As a labor manager.
10:03:48 25       Q.  As a labor manager.
```

### Page 37

```
10:03:48  1       A.  Yes.
10:03:48  2       Q.  Well, are you saying that you -- I'm
10:03:52  3   trying to understand if your payment -- if your
10:03:56  4   compensation was a salaried position or an hourly
10:04:02  5   position.
10:04:04  6       MR. OVERSON:  Asked and answered.
10:04:04  7       Q.  (BY MR. CVITANOVIC)  Are you saying that
10:04:08  8   your compensation was paid by the hour?
10:04:08  9       MR. OVERSON:  Asked and answered.
10:04:10 10       Q.  (BY MR. CVITANOVIC)  As a labor manager.
10:04:10 11       MR. OVERSON:  Asked and answered.
10:04:12 12       THE WITNESS:  Yes.
10:04:14 13       Q.  (BY MR. CVITANOVIC)  You were eligible
10:04:24 14   for vacation?
10:04:24 15       A.  Yes.
10:04:24 16       Q.  You would take vacation?
10:04:26 17       A.  Yes.
10:04:28 18       Q.  You would receive a paycheck when you
10:04:30 19   took vacation?
10:04:30 20       A.  Yes.
10:04:30 21       Q.  Union employees, most of them were not
10:04:36 22   eligible for vacation; isn't that right?
10:04:40 23       A.  It depends on what jurisdiction you were
10:04:44 24   working in throughout the US.
10:04:46 25       Q.  There are jurisdictions in the US where
```

(208)345-9611     M & M COURT REPORTING (208)345-8800 (fax)

b080e889-f0e3-4773-aac9-16a448e45d2e

Page 38

```
10:04:50  1    union employees get no payment when they take a
10:04:56  2    vacation, that is because --
10:04:58  3        A.  In some jurisdictions, yes.
10:04:58  4        Q.  That's right.  They are paid by the
10:05:00  5    hour, they take a vacation, they don't get a
10:05:04  6    check; true?
10:05:04  7        A.  Yes.
10:05:04  8        Q.  But when you took a vacation you still
10:05:08  9    got a check?
10:05:08  10       A.  Yes.  When I submitted a vacation
10:05:10  11   request.
10:05:10  12       Q.  That's right.
10:05:14  13       Were you ever sick from 2003 to 2008,
10:05:22  14   where you missed a day of work because you were
10:05:24  15   sick?
10:05:24  16       A.  No.
10:05:24  17       Q.  You never missed one day of work?
10:05:26  18       A.  Not due to being sick, no.
10:05:28  19       Q.  What about traveling, you travel back
10:05:30  20   home twice a month; right?
10:05:32  21       A.  Yes.
10:05:32  22       Q.  Would you bill for that time?
10:05:36  23       A.  Yes.
10:05:38  24       Q.  Why would you bill for that time if you
10:05:40  25   weren't working, you were traveling?
```

Page 39

```
10:05:42  1        A.  Because I was constantly on the phone
10:05:44  2    and constantly on the Blackberry when I was in
10:05:46  3    the airports in between connections.  I was still
10:05:50  4    working.
10:05:50  5        Q.  You were able to bill 8 hours a day when
10:05:54  6    you traveled from Durham, North Carolina back
10:05:56  7    here to Boise, Idaho?
10:05:58  8        A.  Yes.
10:05:58  9        MR. OVERSON:  Ron, you need to give me
10:06:10  10   an opportunity there if I have an objection.
10:06:10  11       THE WITNESS:  Okay.
10:06:12  12       MR. OVERSON:  So you need to give me a
10:06:14  13   little time slot there.
10:06:16  14       Q.  (BY MR. CVITANOVIC)  Now, would you
10:06:20  15   agree with me on this letter where it says:
10:06:28  16   "Employment classification is nonexempt."  Do you
10:06:30  17   see that?
10:06:30  18       A.  Yes.
10:06:32  19       Q.  Did you know what that meant back in
10:06:36  20   November 4th, 2003?
10:06:38  21       A.  Yes.
10:06:40  22       Q.  And what did you read that to mean; that
10:06:44  23   you would receive overtime?
10:06:46  24       A.  In the capacity if I was possibly put on
10:06:52  25   a job, that was my understanding.
```

Page 40

```
10:06:54  1        Q.  As opposed to doing your labor manager
10:07:04  2    function?
10:07:04  3        A.  Yes.
10:07:06  4        Q.  Did you ever have a discussion with
10:07:14  5    anybody at Kinetic Systems where it says
10:07:16  6    "Employment classification is nonexempt" about
10:07:20  7    whether that was correct or not?
10:07:20  8        MR. OVERSON:  Objection; form of the
10:07:22  9    question, vague.
10:07:26  10       THE WITNESS:  No.
10:07:26  11       Q.  (BY MR. CVITANOVIC)  And as a labor
10:07:32  12   manager you were not entitled to overtime; isn't
10:07:36  13   that correct?
10:07:38  14       MR. OVERSON:  Objection to the form of
10:07:40  15   the question; it's vague.
10:07:42  16       THE WITNESS:  I believe so.
10:07:44  17       Q.  (BY MR. CVITANOVIC)  You believe my
10:07:50  18   statement is correct, that as a labor manager you
10:07:54  19   were not entitled to overtime; that is your
10:07:56  20   understanding?
10:07:56  21       A.  Yes.
10:08:08  22       Q.  Did you ever have what you considered an
10:08:14  23   annual salary or was it all by the hour?
10:08:20  24       A.  I don't believe I had anything that was
10:08:22  25   considered an annual salary, no.
```

Page 41

```
10:08:34  1        MR. OVERSON:  Counsel, I know it's kind
10:08:34  2    of early in the process, but do you mind if we
10:08:38  3    take a break?  Just a short one.
10:08:42  4        MR. CVITANOVIC:  That is fine.  Why
10:08:46  5    don't we -- can we use this as our midmorning
10:08:50  6    break and we'll just push on through until lunch?
10:08:50  7        MR. OVERSON:  Yeah.
10:08:52  8        MR. CVITANOVIC:  Some people are early
10:08:54  9    lunch people.  I don't know what category you
10:08:58  10   fall in.  I'd like to take a quick lunch, like 45
10:09:00  11   minutes, at some point.  So do you like your
10:09:02  12   lunch like at 11:45 or noon?  We are going to
10:09:06  13   take one regardless.  So I'm going to try and
10:09:08  14   structure our breaks around you.  So my question
10:09:14  15   is, we'll come back in ten minutes at 10:20 and
10:09:20  16   then we'll go until lunch, whenever that is.  So
10:09:22  17   do you have a preference of when your --
10:09:24  18       THE WITNESS:  No, sir.
10:09:26  19       MR. CVITANOVIC:  Fair enough.  We are
10:09:26  20   off the record for ten minutes.
10:09:28  21       THE VIDEOGRAPHER:  Time is 10:09 and we
10:09:30  22   are off the record.
10:09:32  23       (Recess taken.)
10:24:54  24       THE VIDEOGRAPHER:  The time is 10:24 and
10:25:04  25   we are on the record.
```

11 (Pages 38 to 41)

b080e889-f0e3-4773-aac9-16a448e45d2e

| | |
|---|---|
| Page 42 | Page 44 |

**Page 42**

```
10:25:04  1        MR. CVITANOVIC:  Can I have the last
10:25:04  2   question and answer read back.
10:25:04  3        (Record read back.)
10:25:28  4        MR. CVITANOVIC:  Next in order.
10:25:28  5        (Exhibit 3 marked.)
10:26:04  6        THE WITNESS:  (Reviewing document.)
10:26:40  7   Q.  (BY MR. CVITANOVIC)  Let me know when
10:26:42  8   you are ready.
10:26:42  9        A.  I'm ready.
10:26:44 10   Q.  Are you ready?
10:26:44 11        Exhibit 3 appears to be two e-mails.
10:26:52 12   The first e-mail from yourself, October 5th,
10:26:58 13   2003.  Did you send this e-mail?
10:27:00 14        A.  Yes.
10:27:02 15   Q.  You drafted the original message of this
10:27:06 16   e-mail; correct?
10:27:06 17        A.  Yes.
10:27:08 18   Q.  And you wrote:  Hourly/salary 62.50 an
10:27:12 19   hour, "$130,000 annual (no overtime)"; you wrote
10:27:20 20   that?
10:27:20 21        A.  That is what it states, yes.
10:27:20 22   Q.  And that is what you understood the deal
10:27:24 23   was with Kinetic Systems for your new position as
10:27:28 24   the labor manager?
10:27:30 25        A.  As a labor manager, yes.
```

**Page 43**

```
10:27:32  1   Q.  Now, you are making a distinction, it
10:27:36  2   sounds like, in your response to me.  Is there
10:27:42  3   some other deal not as a labor manager that is
10:27:50  4   not embraced by this agreement?
10:27:52  5        A.  When I'm working as a labor manager that
10:27:54  6   was what this deal was, yes.
10:27:56  7   Q.  But you always worked as a labor manager
10:28:00  8   from 2003 until you were transferred to the
10:28:06  9   project in Phoenix, the Honeywell project; isn't
10:28:10 10   that true?
10:28:10 11        A.  No, sir.
10:28:12 12   Q.  What other position did you hold between
10:28:16 13   that time, between November 2003 and between the
10:28:20 14   time you were transferred to the Honeywell
10:28:22 15   project in Phoenix?
10:28:24 16        A.  I was assigned projects as project
10:28:28 17   superintendent.
10:28:30 18   Q.  The Coors project; is that what you're
10:28:34 19   saying?
10:28:34 20        A.  That is one of them.
10:28:34 21   Q.  Those are the projects that you list on
10:28:40 22   your spreadsheet for the overtime that you are
10:28:44 23   claiming.
10:28:44 24        A.  Yes.
10:28:44 25   Q.  I think we'll get into that.
```

**Page 44**

```
10:28:50  1        So this Exhibit 3, your e-mail, is only
10:28:54  2   for time that you spent as a labor manager and
10:28:58  3   not for time as a project superintendent?
10:29:02  4        A.  Yes.  Working in the capacity of a labor
10:29:04  5   manager, yes.
10:29:06  6        Q.  Would it make a difference if you were
10:29:08  7   actually on-site as a project superintendent as
10:29:12  8   opposed to being in Durham, North Carolina
10:29:16  9   solving issues for a project, in the Coors
10:29:22 10   project, as an example?
10:29:24 11        A.  Could you rephrase that question.
10:29:24 12        Q.  Okay.  So your office was in Durham,
10:29:28 13   North Carolina; right?
10:29:30 14        A.  As a labor manager.
10:29:30 15        A.  As a labor manager.
10:29:32 16        A.  Yes.
10:29:32 17        Q.  From that office you did your labor
10:29:34 18   management functions.
10:29:38 19        A.  And traveled to various projects, yes.
10:29:40 20        Q.  And from that office you could also do
10:29:46 21   functions that would fall under the project
10:29:52 22   superintendent for a particular project; isn't
10:29:54 23   that right?
10:29:54 24        A.  No, sir.
10:29:56 25        Q.  Was it two separate things?
```

**Page 45**

```
10:29:58  1   A.  Yes, sir.
10:29:58  2        Q.  We'll get into that then.  I want to be
10:30:20  3   clear on one thing with respect to the salary
10:30:24  4   component where you say $130,000 annual.  I want
10:30:28  5   to make sure we have an understanding of how that
10:30:30  6   was paid.  That was an annual salary that you
10:30:38  7   were paid regardless of vacation, sick days,
10:30:42  8   travel time; you got paid that amount whether you
10:30:44  9   billed 7.5 hours a day or 9.5 hours a day as
10:30:50 10   labor manager?
10:30:52 11        A.  Yes.
10:30:52 12   Q.  Have you ever heard the term
10:31:16 13   "nonbargaining unit" employee?
10:31:20 14   A.  Yes.
10:31:20 15   Q.  Do you understand that you fall within
10:31:24 16   that definition for the Idaho Pipe Trades union?
10:31:30 17        MR. OVERSON:  Objection; vague, form of
10:31:32 18   the question.
10:31:34 19        THE WITNESS:  Yes.
10:31:34 20   Q.  (BY MR. CVITANOVIC)  You fell within
10:31:40 21   that definition because of your duties and
10:31:44 22   responsibilities as labor manager?
10:31:46 23        MR. OVERSON:  Objection; vague.
10:31:48 24        THE WITNESS:  Yes.
10:31:48 25   Q.  (BY MR. CVITANOVIC)  Were you aware that
```

b080e889-f0e3-4773-aac9-16a448e45d2e

Page 46

10:32:16  1  after you became a labor manager that Kinetic
10:32:22  2  Systems had to enter into an additional agreement
10:32:26  3  with your union so that the fringe benefits could
10:32:32  4  continue to be paid for persons such as yourself
10:32:34  5  who are nonbargained?
10:32:36  6      A.  Yes.
10:32:38  7      Q.  Did you have any discussions with
10:32:40  8  anybody about that at the union?
10:32:46  9      A.  I did not discuss the content of it, but
10:32:48 10  I was aware of it, that the union was drafting up
10:32:52 11  that specialty agreement.
10:32:54 12      Q.  That was important for you; right?
10:32:56 13      A.  Yes.
10:32:58 14      Q.  Why was it important for you?
10:33:00 15      A.  To continue paying fringe benefits.
10:33:02 16      Q.  Your fringe benefits included what with
10:33:06 17  the union?
10:33:08 18      A.  Health and welfare, pension.
10:33:10 19      Q.  Unless there was a special agreement
10:33:16 20  that was executed between Kinetic Systems and
10:33:18 21  your union, then Kinetic Systems would not be
10:33:22 22  paying those fringe benefits to your union; is
10:33:26 23  that right?
10:33:28 24      A.  Rephrase that.
10:33:30 25      Q.  So unless there was that agreement that

Page 47

10:33:32  1  Kinetic Systems entered into with the local
10:33:36  2  union, the Idaho Pipe Trades, Kinetic Systems
10:33:40  3  would not be making any payments to the union for
10:33:44  4  your benefits; is that right?
10:33:46  5      A.  In the classification of a nonbargained
10:33:50  6  employee, yes.
10:33:52  7      Q.  Which was a labor manager?
10:33:52  8      A.  Yes.
10:33:52  9      Q.  And you're familiar with all these terms
10:33:54 10  because you were the -- you were Kinetic Systems'
10:34:00 11  liaison with the unions?
10:34:02 12      A.  Yes.
10:34:02 13      Q.  With the local unions, wherever the
10:34:04 14  project may be, your job, among other
10:34:08 15  responsibilities, was to find the manpower, hire
10:34:12 16  the manpower to get the project staffed; right?
10:34:16 17      A.  Yes.
10:34:16 18      Q.  You bargained with the local unions as a
10:34:20 19  representative of Kinetic Systems when you were a
10:34:22 20  labor manager?
10:34:24 21      A.  Yes.
10:34:44 22      MR. CVITANOVIC:  Next, No. 4.
10:34:44 23      (Exhibit 4 marked.)
10:35:38 24      THE WITNESS:  (Reviewing document.)
10:35:40 25      Q.  (BY MR. CVITANOVIC)  Let me know when

Page 48

10:35:42  1  you're ready.  I want to sidetrack for a moment,
10:35:46  2  then get to Exhibit 4, but just let me know when
10:35:50  3  you're ready.
10:37:28  4      A.  (Reviewing document.)  Okay.
10:37:30  5      Q.  Before I get to Exhibit 4, I want to ask
10:37:34  6  you some other questions.  Between November
10:37:38  7  2003 -- strike that.  Let me start over.
10:37:40  8      At some point you were transferred to, I
10:37:44  9  was saying the Honeywell project in Phoenix, you
10:37:48 10  were transferred there; right?
10:37:48 11      A.  Yes.
10:37:48 12      Q.  That was in the south region or
10:37:50 13  southwest?  I'm not sure what region that was at
10:37:54 14  that point in time.
10:37:54 15      A.  Southwest.
10:37:56 16      Q.  Southwest region.
10:37:58 17      When were you transferred to that region
10:38:00 18  and that project, approximately?
10:38:04 19      A.  I believe it was July of 2008.
10:38:10 20      Q.  So the period of time between November
10:38:16 21  2003 and July of 2008 when you were then
10:38:24 22  transferred to the southwest region, you were a
10:38:26 23  labor manager during that entire period; correct?
10:38:30 24      A.  Yes.  While I was working as a labor
10:38:38 25  manager capacity, yes.

Page 49

10:38:44  1      Q.  Actually, could you -- would it be more
10:38:58  2  accurate to say you were working as a labor
10:39:00  3  manager that occasionally did project
10:39:04  4  superintendent work?
10:39:06  5      A.  Yes.
10:39:06  6      Q.  So you were continuously a labor
10:39:10  7  manager, but occasionally you would be a project
10:39:14  8  superintendent; that's what you're saying?
10:39:14  9      A.  Yes.  Assigned to projects as the
10:39:18 10  project superintendent.
10:39:20 11      Q.  And your claim is that's when you were
10:39:20 12  assigned project superintendent, that's what made
10:39:24 13  you eligible for overtime.
10:39:24 14      A.  Yes.
10:39:26 15      Q.  During that time period between November
10:39:38 16  2003 and your transfer to the southwest region in
10:39:42 17  Phoenix, the Honeywell project, almost five
10:39:46 18  years, you would have to divide your time on a
10:39:52 19  daily basis between labor management and project
10:39:58 20  superintendent?
10:40:02 21      A.  Could you rephrase that again, please.
10:40:06 22      Q.  Yes.
10:40:06 23      During that period of time between
10:40:08 24  November 2003 and then when you were transferred
10:40:10 25  to the southwest region, you worked on a daily

b080e889-f0e3-4773-aac9-16a448e45d2e

**Page 54**

10:44:42 1  project; isn't that right?
10:44:44 2      MR. OVERSON: Asked and answered.
10:44:46 3      Q. (BY MR. CVITANOVIC) Just like everybody
10:44:46 4  else from Durham who had to go down there, Bob
10:44:50 5  Portman, he had to go down there as well because
10:44:54 6  of the challenges; isn't that true?
10:44:56 7      MR. OVERSON: Asked and answered,
10:45:00 8  question is vague.
10:45:02 9      THE WITNESS: When I went down to that
10:45:06 10 project, I was on that project solely as a
10:45:10 11 project superintendent and didn't have any labor
10:45:12 12 manager responsibilities for the Durham office.
10:45:16 13     Q. (BY MR. CVITANOVIC) Well, did you ever
10:45:18 14 say to anybody at Kinetic Systems: Hey, I'm not
10:45:20 15 doing my labor management job, you know what, I'm
10:45:24 16 not earning my salary over there, so don't pay me
10:45:26 17 for it?
10:45:26 18     A. I was told by Bob Portman that it was
10:45:32 19 going to be handled by the project managers for
10:45:34 20 the Durham operation for the projects that was
10:45:38 21 being -- that was taking place outside of Coors,
10:45:40 22 and my sole focus was supposed to be Coors.
10:45:42 23     Q. Let's talk about Exhibit 4. You've seen
10:45:52 24 this before, haven't you, Exhibit 4, the branch
10:45:56 25 labor manager description?

**Page 55**

10:45:58 1      A. Yes.
10:45:58 2      Q. And did you participate in drafting this
10:46:02 3  document?
10:46:04 4      A. Yes, I did.
10:46:04 5      Q. As labor manager, I want to just kind of
10:46:14 6  go over a few things, in your role as labor
10:46:16 7  manager from 2003 all the way to and including
10:46:22 8  the transfer to the southwest in July of 2008 --
10:46:30 9  did I get the dates right?
10:46:32 10     A. Yes.
10:46:32 11     Q. So when I say your role as labor
10:46:36 12 manager, I'm talking that entire period of time,
10:46:38 13 so I don't have to keep saying the dates. I will
10:46:42 14 if you want me to.
10:46:44 15     So between the period of time, again
10:46:46 16 just for clarity here, November 4, 2003 and the
10:46:56 17 time you were transferred to the southwest region
10:46:58 18 in July of 2008 as labor manager, I want to go
10:47:02 19 over some of the things you did. We already
10:47:04 20 talked about as the labor manager you were being
10:47:08 21 the liaison with the local union; right?
10:47:12 22     A. Yes.
10:47:14 23     Q. As a matter of fact, you would also --
10:47:18 24 at some point in time you negotiated the Kinetic
10:47:24 25 Systems, the drug policy with the local unions;

**Page 56**

10:47:28 1  isn't that right?
10:47:28 2      A. Only with Local 421.
10:47:30 3      Q. But you did it; correct?
10:47:34 4      A. Participated in that, yes.
10:47:36 5      Q. You participated in the drafting of
10:47:38 6  company policy with respect to per diems?
10:47:42 7      A. Yes.
10:47:42 8      Q. You participated in the drafting of the
10:47:48 9  company pay policy; isn't that right?
10:47:56 10     MR. OVERSON: Form of the question;
10:47:58 11 vague.
10:48:00 12     THE WITNESS: Reword that, please. I
10:48:02 13 don't...
10:48:02 14     Q. (BY MR. CVITANOVIC) Did you participate
10:48:04 15 during this time period in the formulation of the
10:48:10 16 company's pay policy?
10:48:12 17     MR. OVERSON: Same objection; form of
10:48:14 18 the question, vague.
10:48:14 19     THE WITNESS: I'm not sure I understand.
10:48:16 20 A pay policy for who?
10:48:18 21     Q. (BY MR. CVITANOVIC) For the nonexempt
10:48:20 22 employees.
10:48:22 23     MR. OVERSON: Same objection.
10:48:24 24     THE WITNESS: No. Nonexempt, no.
10:48:28 25     Q. (BY MR. CVITANOVIC) I'll get to that

**Page 57**

10:48:32 1  later.
10:48:40 2      Back in this time period you were
10:48:40 3  familiar with the employee manual?
10:48:44 4      MR. OVERSON: Objection; form of the
10:48:46 5  question, it's vague.
10:48:46 6      Q. (BY MR. CVITANOVIC) You knew there was
10:48:48 7  an employee manual; right?
10:48:50 8      A. I knew that one existed, yes.
10:48:52 9      Q. Did you know it was also on the company
10:48:56 10 intranet?
10:48:56 11     A. No.
10:48:56 12     Q. Did you ever look at the employee
10:49:00 13 manual?
10:49:00 14     A. No.
10:49:00 15     Q. Did you ever -- so during this time
10:49:08 16 period you never looked at the employee manual?
10:49:10 17     MR. OVERSON: Objection; form of the
10:49:12 18 question, vague.
10:49:14 19     THE WITNESS: No, I never looked at it
10:49:14 20 because I felt that was for exempt employees,
10:49:18 21 nonunion employees.
10:49:18 22     Q. (BY MR. CVITANOVIC) What about the
10:49:20 23 company's vacation policy?
10:49:22 24     MR. OVERSON: Same objection.
10:49:24 25     Q. (BY MR. CVITANOVIC) Were you aware of

Page 58

```
10:49:26  1   the company's vacation policy?
10:49:28  2         MR. OVERSON: Same objection.
10:49:28  3         THE WITNESS: Not --
10:49:30  4         MR. CVITANOVIC: What's your objection?
10:49:32  5   Will you state the --
10:49:32  6         MR. OVERSON: Form of the question and
10:49:32  7   it's vague.
10:49:34  8   Q.  (BY MR. CVITANOVIC) Were you aware that
10:49:36  9   the company had a vacation policy?
10:49:38 10         MR. OVERSON: Same objection.
10:49:40 11         THE WITNESS: I was not aware of the
10:49:44 12   specifics associated with vacation policy, no.
10:49:46 13   Q.  (BY MR. CVITANOVIC) But you were aware
10:49:48 14   that there was a vacation policy?
10:49:50 15         MR. OVERSON: Same objection; form of
10:49:50 16   the question, it's vague.
10:49:52 17         THE WITNESS: I never looked at the
10:49:54 18   employee manual, so I don't know what the policy
10:49:56 19   was.
10:49:56 20   Q.  (BY MR. CVITANOVIC) Didn't you at some
10:50:00 21   point in time send an e-mail to Durham to Alexa
10:50:06 22   Koontz specifically saying that you were subject
10:50:08 23   to Kinetics' vacation policy?
10:50:10 24         MR. OVERSON: Objection; form of the
10:50:12 25   question, vague.
```

Page 59

```
10:50:16  1         THE WITNESS: I don't recollect.
10:50:18  2   Q.  (BY MR. CVITANOVIC) Didn't you on
10:50:18  3   documents that you drafted yourself say that your
10:50:22  4   vacation was per Kinetics' vacation policy?
10:50:26  5         MR. OVERSON: Same objection.
10:50:28  6         THE WITNESS: I don't recollect. I
10:50:30  7   remember having communication with Alexa
10:50:32  8   regarding vacation, yes. But I don't recollect
10:50:36  9   it being per the policy.
10:50:40 10   Q.  (BY MR. CVITANOVIC) Your discussion
10:50:42 11   with Alexa about the vacation policy occurred
10:50:46 12   after your termination.
10:50:48 13   A.  Yes.
10:50:48 14   Q.  That's when you were informed that the
10:51:00 15   vacation policy had a max accrual of two times
10:51:04 16   annual?
10:51:04 17   A.  After my termination that is what Alexa
10:51:06 18   had informed me of.
10:51:08 19   Q.  Did you ever verify that with her, that
10:51:10 20   that was company policy?
10:51:10 21   A.  I had no way to verify unless she was to
10:51:16 22   send me the employee manual.
10:51:20 23   Q.  Did you look at it?
10:51:20 24   A.  No, I never had it. I didn't even have
10:51:24 25   access to it at that time.
```

Page 60

```
10:51:26  1   Q.  Do you dispute that Kinetics had a
10:51:32  2   vacation policy during the time frame that we're
10:51:36  3   talking about that limited vacation to two times
10:51:38  4   annual?
10:51:40  5   A.  Yes.
10:51:40  6         MR. OVERSON: Objection. You have to
10:51:42  7   give me a chance to get my objection.
10:51:42  8         THE WITNESS: Okay. Sorry.
10:51:44  9         MR. OVERSON: Objection; question is
10:51:44 10   vague, so form of the question.
10:51:48 11   Q.  (BY MR. CVITANOVIC) The answer is
10:51:50 12   "yes"?
10:51:50 13   A.  Repeat the question again.
10:51:52 14   Q.  The question is: At some point you
10:51:56 15   became aware that Kinetic Systems had a vacation
10:52:02 16   policy that applied to you that limited your
10:52:04 17   vacation accrual to two times annual?
10:52:08 18   A.  After my termination and Alexa, I was
10:52:12 19   sending the information to Alexa of what I felt
10:52:14 20   was owed to me in vacation based on the offer
10:52:20 21   letter, and she was telling me at that point that
10:52:24 22   I had to abide by the vacation policy when I was.
10:52:28 23   And I disputed that, stating that that was for
10:52:32 24   exempt employees, not nonexempt, as per my offer
10:52:36 25   letter.
```

Page 61

```
10:52:36  1   Q.  Well, you realize that you were an
10:52:44  2   exempt employee as a labor manager?
10:52:44  3   A.  No. Well, let me rephrase that. As a
10:52:52  4   labor manager I realized that I was not eligible
10:52:54  5   for overtime.
10:52:58  6   Q.  Well, you wrote e-mails in 2007 and 2008
10:53:02  7   saying that you were an exempt employee, did you
10:53:06  8   not?
10:53:06  9   A.  I don't recollect identifying myself as
10:53:16 10   exempt.
10:53:24 11         MR. CVITANOVIC: Let's do the next
10:53:26 12   document. This will be No. 5.
10:53:26 13         (Exhibit 5 marked.)
10:53:26 14         THE WITNESS: (Reviewing document.)
10:55:10 15   Q.  (BY MR. CVITANOVIC) Let me know when
10:55:12 16   you are ready to answer questions about Exhibit
10:55:14 17   5.
10:56:00 18   A.  (Reviewing document.) Okay.
10:56:00 19   Q.  So did you participate in the drafting
10:56:06 20   of this position description for project
10:56:10 21   superintendent?
10:56:10 22   A.  Yes, I did.
10:56:10 23   Q.  As a matter of fact, were you the author
10:56:14 24   of this?
10:56:16 25   A.  I believe myself and Jeff Dehaan was.
```

16  (Pages 58 to 61)

b080e889-f0e3-4773-aac9-16a448e45d2e

Page 66

11:02:34 1  was my sole responsibility, and that they were
11:02:38 2  supposed to handle things themselves.
11:02:40 3      Q.  So when we look at your e-mail that we
11:02:46 4  have, the thousands of e-mails between those two
11:02:48 5  dates, between October 9, 2005 and November 5,
11:02:54 6  2006, we're only going to see a handful of
11:02:58 7  e-mails dealing with your job as labor manager;
11:03:02 8  it's all going to be relative to Coors?
11:03:04 9      MR. OVERSON:  Objection; form of the
11:03:04 10 question, assumes facts not in evidence,
11:03:08 11 foundational problems.
11:03:10 12     THE WITNESS:  Repeat the question,
11:03:12 13 please.
11:03:12 14     Q.  (BY MR. CVITANOVIC)  When we, and you're
11:03:14 15 going to get these, your lawyer is going to get
11:03:18 16 these tomorrow or Thursday, when we go through
11:03:24 17 your e-mail between those dates, November 9, 2005
11:03:28 18 and -- excuse me, October 9, 2005 and November
11:03:32 19 5th, 2006 when you were the superintendent of the
11:03:36 20 Coors project, are you saying we're only going to
11:03:40 21 find a handful of e-mails from you addressing
11:03:44 22 what would normally fall under your
11:03:48 23 responsibility as a labor manager?
11:03:50 24     MR. OVERSON:  Same objection; lack of
11:03:54 25 foundation, assumes facts not in evidence, form

Page 67

<mark>11:03:56 1  of the question, vague.</mark>
<mark>11:04:00 2      THE WITNESS:  I can't define exactly how</mark>
<mark>11:04:02 3  many there will be, but I know that there was</mark>
<mark>11:04:06 4  probably still some communication, people looking</mark>
<mark>11:04:08 5  for some guidance.</mark>
11:04:10 6      Q.  (BY MR. CVITANOVIC)  So the answer to my
11:04:14 7  question is between October 9, 2005 and November
11:04:14 8  5, 2006 when you were at the Coors project, you
11:04:18 9  continued to work as a labor manager?
11:04:22 10     MR. OVERSON:  Could you read the
11:04:22 11 question back.
11:04:36 12     (Record read back.)
11:04:38 13     MR. OVERSON:  Objection; asked and
11:04:40 14 answered, vague and assumes fact not in evidence.
11:04:44 15     THE WITNESS:  In partial applications,
11:04:48 16 just in a support when I got the phone calls
11:04:50 17 probably or e-mails.
<mark>11:04:52 18     Q.  (BY MR. CVITANOVIC)  I believe it's a</mark>
<mark>11:04:52 19 yes/no question.</mark>
<mark>11:04:54 20     You continued to work as a labor manager</mark>
<mark>11:04:56 21 between October 2005 and November 2006; isn't</mark>
<mark>11:05:00 22 that right?</mark>
<mark>11:05:00 23     MR. OVERSON:  Objection; asked and</mark>
<mark>11:05:02 24 answered, vague, form of the question.</mark>
<mark>11:05:06 25     THE WITNESS:  Yes.</mark>

Page 68

11:05:06 1      Q.  (BY MR. CVITANOVIC)  When you were the
11:05:30 2  project superintendent at Coors, how many
11:05:32 3  employees did you supervise on average?
11:05:34 4      A.  That job, I believe, got up to 280-plus.
11:05:44 5      Q.  Who did you report to then?  If you --
11:05:54 6  you were the regional labor manager at that
11:05:58 7  point.
11:05:58 8      A.  As a project superintendent I reported
11:06:00 9  to the project manager, Dan Schall.
11:06:06 10     Q.  For Coors, was there an existing -- for
11:06:18 11 the Coors project, was there an existing
11:06:20 12 agreement in place with the local union when
11:06:26 13 Coors was trying to get up and running or was
11:06:30 14 there an agreement that had to be negotiated?
11:06:32 15     MR. OVERSON:  Objection; it's vague,
11:06:34 16 form of the question.
11:06:34 17     THE WITNESS:  There was a PLA for that
11:06:42 18 project.
11:06:42 19     Q.  (BY MR. CVITANOVIC)  Project labor
11:06:42 20 agreement?
11:06:42 21     A.  Yeah.  That was initiated by the
11:06:46 22 building trades for that project.
11:06:50 23     Q.  Who was responsible for negotiating the
11:06:52 24 project labor agreement on behalf of Kinetic
11:06:56 25 Systems; was that you?

Page 69

11:06:56 1      A.  No.  That project labor agreement was
11:07:00 2  negotiated by Jacobs and the building trades.
11:07:04 3  The only responsibility that Kinetics had was
11:07:08 4  communicating the jurisdictional assignments
11:07:12 5  under that building trades agreement, under that
11:07:16 6  PLA.
11:07:16 7      Q.  The jurisdictional assignments with
11:07:18 8  respect to the different trades or in what
11:07:22 9  respect?
11:07:22 10     A.  Yes.
11:07:22 11     Q.  The different trades?
11:07:24 12     And who was then responsible at
11:07:28 13 Kinetics -- or I'll just ask you:  Weren't you
11:07:30 14 the person responsible at Kinetics for ensuring
11:07:36 15 Kinetics' compliance with the project labor
11:07:40 16 agreement?
11:07:40 17     A.  Well, the project superintendent would
11:07:42 18 be.
11:07:42 19     Q.  That was you?
11:07:42 20     A.  On any project.
11:07:44 21     Q.  That was you at Coors?
11:07:44 22     A.  Yes.
11:07:46 23     Q.  Who hired the labor at the Coors
11:07:54 24 project?
11:07:54 25     A.  I did.

18  (Pages 66 to 69)

b080e889-f0e3-4773-aac9-16a448e45d2e

Page 70

```
11:07:54  1        Q.  Did you ever have to fire anybody?
11:07:56  2        A.  Yes.
11:07:56  3        Q.  So you hired the labor at Coors, you
11:08:00  4   fired people, you implemented the project labor
11:08:04  5   agreement, you supervised employees, you managed
11:08:10  6   the field labor; is that right?
11:08:12  7        MR. OVERSON:  Objection; form of the
11:08:14  8   question, it's compound.
11:08:16  9        THE WITNESS:  First off, I didn't
11:08:18 10   implement the project labor agreement.  I abided
11:08:22 11   by the terms of the project labor agreement.
11:08:26 12        Q.  (BY MR. CVITANOVIC)  Thank you for
11:08:26 13   clarifying that.
11:08:30 14        You ensured that Kinetics abided by the
11:08:32 15   terms of the project labor agreement?
11:08:34 16        A.  Yes.
11:08:34 17        Q.  Your job as project superintendent for
11:08:38 18   Coors was also to manage field labor?
11:08:42 19        A.  Yes.
11:08:42 20        Q.  Also make sure that the KSI safety
11:09:02 21   policies were enforced?
11:09:02 22        A.  Yes.
11:09:04 23        Q.  Would you have site-specific policies
11:09:06 24   that you implemented that perhaps were necessary
11:09:10 25   for Coors?
```

Page 71

```
11:09:12  1        MR. OVERSON:  What is the question?
11:09:14  2        (Record read back.)
11:09:24  3        MR. OVERSON:  Vague.
11:09:24  4        Q.  (BY MR. CVITANOVIC)  What I mean by
11:09:26  5   that, KSI has a safety policy; right?
11:09:28  6        A.  Yes.
11:09:28  7        Q.  There's safety managers throughout the
11:09:32  8   country; right?
11:09:34  9        A.  Yes.
11:09:34 10        Q.  Their sole job is to ensure, to the
11:09:38 11   extent they can, that the projects are safe for
11:09:42 12   the employees?
11:09:42 13        A.  Yes.
11:09:42 14        Q.  Now, are there occasions from time to
11:09:46 15   time that there might be a unique hazard
11:09:50 16   presented by a project?
11:09:54 17        A.  Sometimes, yes.
11:09:54 18        Q.  And that require additional safety
11:09:58 19   considerations?
11:10:00 20        A.  Yes.
11:10:00 21        Q.  Was there anything like that at Coors?
11:10:02 22        A.  There were three full-time safety
11:10:06 23   managers or safety professionals on that job,
11:10:08 24   that if there were any specifics that required
11:10:12 25   something outside of the ordinary policy, that
```

Page 72

```
11:10:16  1   they would make me aware of it, they'd draft up
11:10:18  2   the policy and I would have to implement it.
11:10:20  3        Q.  And you would participate in the
11:10:22  4   discussions about the drafting of that policy?
11:10:26  5        A.  They would probably give me copies and
11:10:28  6   I'd make comments.  I don't remember any
11:10:32  7   specifics, but that is through communication on
11:10:36  8   the project, yes.
11:10:36  9        Q.  I went through your claim in detail and
11:11:36 10   I just want to confirm something that appears
11:11:40 11   obvious to me, that the first time you're
11:11:44 12   requesting overtime in this case is October 9,
11:11:50 13   2005.
11:11:58 14        A.  I believe so.  I'd have to look at my
11:12:00 15   time cards.
11:12:00 16        Q.  I want to -- well, I want to just
11:12:06 17   confirm that we're not dealing with anything
11:12:10 18   before that date, because it's not in your claim
11:12:12 19   and I just want to make sure we could just ignore
11:12:14 20   everything --
11:12:14 21        A.  Yes.
11:12:14 22        Q.  -- that occurred before October 9th,
11:12:20 23   2005.
11:12:22 24        MR. OVERSON:  Yes.  Because of the
11:12:24 25   statute of limitations, we believe those claims
```

Page 73

```
11:12:30  1   have run under the statute of limitations, so we
11:12:34  2   only made it within the period of the statute of
11:12:36  3   limitations.
11:12:38  4        MR. CVITANOVIC:  I don't know if your
11:12:40  5   microphone -- there it is.  Your black tie
11:12:44  6   covered the microphone.
11:12:44  7        MR. OVERSON:  I've got it hidden.
11:12:54  8        Does that make sense, Counsel?
11:12:56  9        MR. CVITANOVIC:  Yeah, it does.
11:12:56 10        Q.  (BY MR. CVITANOVIC)  But I wanted to
11:12:56 11   make sure that I understand something.  Without
11:13:04 12   invading the relationship, the attorney-client
11:13:08 13   relationship and the discussions that you've had
11:13:08 14   with your lawyer, do you claim that you are owed
11:13:18 15   overtime before October 9, 2005 that you should
11:13:26 16   get except for the statute of limitations?  Was
11:13:32 17   part of your claim for overtime work from before
11:13:36 18   October 9, 2005?  I'm just trying to understand
11:13:40 19   if this is a statute of limitations issue or if
11:13:44 20   there was just no claim at all.
11:13:50 21        A.  That was the first time I was
11:13:56 22   collecting -- that I would be looking for
11:13:58 23   compensation for overtime is that date.
11:14:02 24        Q.  Meaning that's the first time that you
11:14:10 25   believe that your duties and responsibilities,
```

b080e889-f0e3-4773-aac9-16a448e45d2e

## Page 74

11:14:18  1    whatever you want to, however you want to say it,
11:14:20  2    changed to the point where you felt that you were
11:14:24  3    entitled to overtime?
11:14:26  4        MR. OVERSON:  Objection to the form of
11:14:28  5    the question.
11:14:28  6        MR. CVITANOVIC:  October 9, 2005.
11:14:30  7        MR. OVERSON:  Counsel, I'm trying to get
11:14:32  8    an objection on the record.
11:14:34  9        I object to the form of the question, it
11:14:36 10    misstates his prior testimony and it's vague.
11:14:42 11        Go ahead.
11:14:42 12        THE WITNESS:  For that project, yes.
11:14:46 13        Q.  (BY MR. CVITANOVIC)  Well, was there any
11:14:52 14    project when you first became a labor manager in
11:14:56 15    2000 until October 9, 2005 where you felt that
11:15:02 16    you were entitled to overtime?
11:15:06 17        A.  In 2003 when I worked at Sandhill in
11:15:10 18    Austin, Texas.
11:15:14 19        Q.  There was overtime that was not paid?
11:15:18 20        A.  Yes.
11:15:18 21        Q.  Do you know how much that was
11:15:20 22    approximately?
11:15:22 23        A.  I've got records.  Off the top of my
11:15:26 24    head I don't know.
11:15:28 25        Q.  Was that because you were the project

## Page 75

11:15:30  1    superintendent?
11:15:30  2        A.  Yes.
11:15:32  3        Q.  If it's not part of this claim, then we
11:15:42  4    are not going to --  I just wanted to understand
11:15:46  5    it.
11:15:46  6        MR. OVERSON:  That makes sense.
11:15:46  7        Q.  (BY MR. CVITANOVIC)  The prior time
11:15:52  8    period.
11:16:10  9        From the time you became the labor
11:16:14 10    manager under this written agreement, November 4,
11:16:16 11    2003, until July 2008 when you moved to the
11:16:20 12    southwest, did you tell anybody at Kinetic
11:16:22 13    Systems that you felt you were entitled to
11:16:24 14    overtime?
11:16:26 15        A.  Bob Portman on many occasions.
11:16:30 16        Q.  Did you tell him that you felt you were
11:16:36 17    entitled to overtime on Coors?
11:16:38 18        A.  Yes.  I also had mentioned it to Dan
11:16:42 19    Schall, who was the project manager on Coors.
11:16:48 20        Q.  On Coors.  Schall, how does he spell
11:16:50 21    that last name?
11:16:50 22        A.  S-c-h-a-l-l.
11:16:52 23        Q.  So you told Bob on multiple occasions
11:17:00 24    that you felt that you were entitled to overtime?
11:17:02 25        A.  On the phone, yes, sir.

## Page 76

11:17:04  1        Q.  On the phone.
11:17:06  2        Did you ever tell him that in e-mail?
11:17:08  3        A.  Not that I recollect.
11:17:10  4        Q.  What about Dan Schall, you told him that
11:17:20  5    you felt you were entitled to overtime?
11:17:22  6        A.  In person.
11:17:22  7        Q.  Did Bob ever tell you that you were
11:17:30  8    entitled to overtime?
11:17:32  9        A.  No.  I think in -- if I recollect, I'd
11:17:42 10    even had some conversations with Alexa and that
11:17:44 11    was where she had mentioned to me that labor
11:17:50 12    managers were not eligible for overtime.
11:17:52 13        Q.  Well, you knew that already, labor
11:18:00 14    managers were not eligible for overtime, didn't
11:18:02 15    you know that?
11:18:04 16        A.  In the capacity of a labor manager.
11:18:06 17        Q.  Did you try and explain to Alexa that
11:18:10 18    you were working in another capacity?
11:18:10 19        A.  Yeah, I believe I mentioned it to Bob
11:18:14 20    and Alexa and Dan in saying all superintendents
11:18:18 21    get paid overtime within the company.  And if I'm
11:18:22 22    working in the capacity of a project
11:18:24 23    superintendent, I ought to be entitled as well.
11:18:26 24        Q.  Did you ever do that in writing in any
11:18:34 25    way, shape or form, tell anybody at Kinetic

## Page 77

11:18:36  1    Systems during this time period that you felt
11:18:40  2    that there was a change in classification which
11:18:44  3    entitled you to overtime?
11:18:46  4        A.  Not in an e-mail, no, I don't believe
11:18:48  5    so.
11:18:48  6        Q.  What about a letter?
11:18:50  7        A.  I don't believe so.  It was all verbal.
11:18:54  8        Q.  How would you express it to Bob?  Tell
11:19:04  9    me how you told Bob Portman that you felt you
11:19:08 10    were entitled to overtime.  Use as many of the
11:19:12 11    words that you can remember from one of those
11:19:14 12    conversations.
11:19:14 13        A.  Well, one of the items with Bob as well
11:19:22 14    as Dan Schall was when I was looking for support
11:19:26 15    on that project that required management support
11:19:34 16    is I said:  You've got to get people here on
11:19:36 17    weekends, you're having me work weekends for no
11:19:40 18    compensation, why don't you have your people, the
11:19:42 19    management here, working for no compensation.
11:19:46 20        And Bob said that he'd make some phone
11:19:50 21    calls and he'd get that corrected.  And Dan
11:19:54 22    Schall had told me:  Well, you make more money
11:19:54 23    than they do, is why they aren't required to work
11:19:58 24    weekends and I was.
11:20:02 25        Q.  You would work weekends as labor

b080e889-f0e3-4773-aac9-16a448e45d2e

Page 78

11:20:04 1  manager, wouldn't you?
11:20:06 2      A.  No.
11:20:06 3      Q.  You would work more than 8 hours a day
11:20:10 4  as labor manager.
11:20:12 5      A.  There were times as a labor manager when
11:20:14 6  I would get phone calls to support labor, find
11:20:20 7  qualified resources, and have to make phone calls
11:20:24 8  to people at their homes on a weekend or after
11:20:28 9  hours as a labor manager.
11:20:30 10     Q.  A minute ago I asked you about a date
11:20:34 11 and you pulled a piece of paper out of your
11:20:36 12 pocket.  What piece of paper was that?
11:20:38 13     A.  Those are just dates that I have that I
11:20:40 14 was on these projects as project superintendent.
11:20:42 15     Q.  Can I take a look at that?
11:20:44 16     A.  Yeah.  (Handing.)
11:20:50 17     Q.  When did you write these down?
11:20:52 18     A.  This morning.
11:20:54 19     Q.  What did you look at?
11:20:56 20     A.  Time cards.
11:20:58 21     Q.  So you looked at your time cards this
11:21:00 22 morning?
11:21:00 23     A.  The time cards that I had submitted,
11:21:02 24 yeah.
11:21:04 25     Q.  And the time cards that you submitted,

Page 79

11:21:08 1  did they have overtime on them?
11:21:10 2      A.  Yes.  Well, not -- the time cards that I
11:21:16 3  submitted to Kinetics, no, they didn't.  But they
11:21:20 4  had records of the hours that was overtime owed
11:21:24 5  for those projects.
11:21:28 6      Q.  We'll make a photocopy of this and I'll
11:21:34 7  give you back the original.  This will be No. 6.
11:21:46 8      MR. OVERSON:  We can take a short break
11:21:46 9  and make a copy.
11:21:46 10     MR. CVITANOVIC:  We'll do it this way
11:21:52 11 for right now.  Just write it there.  Then you'll
11:21:52 12 get the original back.
11:21:54 13     MR. OVERSON:  Let the record reflect
11:21:56 14 that the "6" at the bottom there has been written
11:22:00 15 on it by Counsel.
11:22:02 16     (Exhibit 6 marked.)
11:22:02 17     MR. CVITANOVIC:  Exactly.  I agree.
11:22:12 18 Could you read his last answer back on
11:22:14 19 the time cards.
11:22:14 20     (Record read back.)
11:22:36 21     Q.  (BY MR. CVITANOVIC)  So the time cards
11:22:38 22 that you submitted, let's take the Coors example,
11:22:44 23 Coors project, when you were submitting time
11:22:46 24 cards for Coors, are you saying those did not
11:22:50 25 contain overtime?

Page 80

11:22:52 1      A.  No.  They identified 40 hours.
11:22:56 2      Q.  40 hours, no overtime; correct?
11:22:58 3      A.  Yes, correct.
11:23:00 4      Q.  Your answer said that Kinetic Systems
11:23:04 5  had a record of the overtime however.
11:23:08 6      A.  No.  I had record.
11:23:10 7      Q.  You had a record of the overtime.  How
11:23:14 8  did you have a record of the overtime?
11:23:16 9      A.  Based on the scheduled overtime for that
11:23:22 10 project and what labor was working and knowing
11:23:24 11 how many hours that I had put in.  So I kept it
11:23:30 12 myself.
11:23:30 13     Q.  So you kept the overtime yourself?
11:23:34 14     A.  Yes.
11:23:34 15     Q.  And did you tell anybody at Kinetic
11:23:38 16 Systems that you were keeping track of your
11:23:40 17 overtime?
11:23:40 18     A.  Probably not on Coors other than
11:23:46 19 constantly talking with Bob Portman and Dan
11:23:50 20 Schall about being owed overtime, but not
11:23:52 21 necessarily telling them that I was keeping a
11:23:54 22 record of it.
11:23:54 23     Q.  Did you ever say to them in any way that
11:24:04 24 could be interpreted that you were going to make
11:24:06 25 a claim for this one day?

Page 81

11:24:08 1      A.  No, I did not.
11:24:10 2      Q.  Didn't you think that was an important
11:24:23 3  piece of information?
11:24:26 4      MR. OVERSON:  Objection; vague.
11:24:32 5      THE WITNESS:  This whole case of
11:24:36 6  compensation for overtime is important
11:24:38 7  information, yes.
11:24:38 8      Q.  (BY MR. CVITANOVIC)  You didn't think it
11:24:40 9  was important to tell them that you were keeping
11:24:42 10 track of your own time so at some point later on
11:24:46 11 in the future you could get paid for it?
11:24:48 12     A.  Whenever I felt that I wasn't getting
11:24:52 13 any response for Coors, for projects after that
11:24:54 14 that you said that we'll get into, I did turn
11:24:58 15 over records of my time that I was keeping.
11:25:02 16     Q.  But that was just the regular time.
11:25:04 17     A.  No.  I handed overtime information for
11:25:10 18 the Lilly project directly to Bob Portman.
11:25:12 19     Q.  Your overtime?
11:25:14 20     A.  Records of it.
11:25:14 21     Q.  In what way; on time cards?
11:25:18 22     A.  On time cards.
11:25:20 23     Q.  So you submitted time cards on the Lilly
11:25:24 24 project that had you billing overtime.
11:25:28 25     A.  Not to payroll, to Bob Portman.

(208)345-9611      M & M COURT REPORTING (208)345-8800 (fax)

b080e889-f0e3-4773-aac9-16a448e45d2e

## Page 118

13:27:48 1    A.  Durham.

13:27:50 2    Q.  But didn't you give up your -- didn't

13:27:54 3 you just tell me you already gave up your

13:27:56 4 apartment?

13:27:56 5    A.  I didn't have an apartment in Durham.

13:27:58 6 It was expenses on a hotel.  And I had an

13:28:04 7 apartment in Virginia that was on a

13:28:06 8 month-by-month basis.

13:28:08 9    Q.  Well, you had at one point an apartment

13:28:12 10 in Durham.

13:28:14 11    A.  A couple different times, yes.

13:28:16 12    Q.  Then you went to a hotel?

13:28:20 13    A.  Yes.

13:28:20 14    Q.  When did that happen?

13:28:22 15    A.  I would have to -- I can't remember the

13:28:28 16 date off the top of my head.  It was, the reason

13:28:30 17 that I went on expenses is because I believe

13:28:36 18 Kinetics didn't want to lease the apartment any

13:28:40 19 more, that was after Chris Durand had left.  So

13:28:44 20 that would have probably been 2004, first of

13:28:54 21 2005.

13:28:56 22    Q.  What I'm not understanding is after Jody

13:29:04 23 quits does Bob tell you, look, you have to be the

13:29:08 24 project superintendent?

13:29:10 25    A.  It was a corporate decision between Bob

## Page 119

13:29:14 1 and I guess Bob Pragada that I was going to be on

13:29:16 2 that job full time.

13:29:22 3    Q.  Did he send you an e-mail in that

13:29:32 4 regard?

13:29:32 5    A.  No.  The only thing I saw was this, was

13:29:36 6 the personnel change notice.  And there was

13:29:38 7 conversations that we had that I was going to

13:29:40 8 take over the job as superintendent.

13:29:42 9    Q.  But he executed Exhibit 11, which is

13:29:46 10 your PCN, before Jody gave notice or left.

13:29:52 11    A.  Yep.

13:29:54 12    Q.  What I'm wondering is if you thought you

13:29:58 13 were then entitled to overtime with Bob, why

13:30:06 14 didn't you write an e-mail to him about that?

13:30:08 15    A.  Because I was having phone calls with

13:30:10 16 him constantly about that.  It was just, I guess,

13:30:14 17 a gentleman's agreement that I thought our verbal

13:30:18 18 conversations related to the overtime was good

13:30:20 19 enough that I didn't need to write an e-mail.

13:30:22 20    Q.  So you didn't think it was necessary to

13:30:26 21 write an e-mail documenting the fact that you

13:30:28 22 would then be entitled to overtime and double

13:30:32 23 time in addition to your normal pay?

13:30:36 24    A.  Other than him telling me, we'll work

13:30:40 25 something out, we'll work something out.

## Page 120

13:30:42 1    Q.  Then nothing got worked out?

13:30:44 2    A.  That was a couple of the conversations

13:30:46 3 that I had with Alexa also and she had mentioned

13:30:50 4 that labor managers were exempt, weren't entitled

13:30:54 5 to overtime.

13:30:54 6    Q.  So you were feeling pretty -- how did

13:30:58 7 this make you feel that you weren't getting an

13:31:02 8 answer to your question?

13:31:02 9    A.  Upset.

13:31:04 10    Q.  And then what happened with Puerto Rico,

13:31:08 11 because you went into the same, it was the same

13:31:10 12 situation all over again in Puerto Rico?

13:31:12 13    A.  That's when I brought the time cards

13:31:14 14 back, I believe it was on the 10th of July when I

13:31:16 15 came back, finally had a chance to sit down with

13:31:20 16 Portman and gave him copies of all my time cards

13:31:24 17 reflecting the overtime that I worked down there,

13:31:26 18 even though I was having conversations on the

13:31:30 19 phone with him about that then, about that job,

13:31:32 20 too.

13:31:32 21    Q.  And again, no e-mail to Bob confirming a

13:31:36 22 discussion that you felt that Kinetics had not

13:31:38 23 done you right in Coors and you were in a new

13:31:44 24 project, Puerto Rico, where it's all lining up to

13:31:50 25 be the same thing and you still didn't feel that

## Page 121

13:31:52 1 it was worthy of an e-mail?

13:31:54 2    A.  Not worthy as an e-mail.  I put trust in

13:31:56 3 what people tell me.

13:31:58 4    Q.  But you had already been burned.

13:32:00 5    A.  Well, about the third time of being

13:32:04 6 burned when I was over at Biogen is when I

13:32:04 7 finally said enough is enough, you're taking

13:32:06 8 advantage of me, and that's when I started

13:32:08 9 putting stuff in e-mails.

13:32:10 10    Q.  What did you put in e-mail?

13:32:12 11    A.  There was an e-mail to Sandra Kellam

13:32:14 12 that I had overtime on my time card and that was

13:32:16 13 out of the norm, but you needed to talk to Bob

13:32:20 14 Portman because I got into an argument with him

13:32:22 15 that I kept getting taken advantage of.

13:32:28 16    Q.  Did you bill the GSK job?

13:32:46 17    A.  I was told to bill MedImmune while I was

13:32:52 18 working on GSK.

13:32:54 19    Q.  Who told you to do that?

13:32:56 20    A.  Bob Portman and then Dan Schall was

13:33:00 21 aware that I was charging his job, because Dan

13:33:04 22 Schall was on MedImmune.

13:33:06 23    Q.  So why did you ask -- did you ask them:

13:33:12 24 Why do you want me to bill MedImmune when I'm

13:33:16 25 working GSK?

Page 122

13:33:16  1  A.  I asked constantly, and usually that's
13:33:20  2  the case when a job is financially strapped, that
13:33:24  3  they're already spending more money or losing
13:33:26  4  money on a particular project and they want to
13:33:28  5  reallocate my cost to a different job.
13:33:32  6  Q.  When you were the -- it's your testimony
13:33:38  7  that you were also the project superintendent for
13:33:40  8  Lilly in Puerto Rico?
13:33:42  9  A.  Yes.
13:33:42 10  Q.  Again, you supervised approximately how
13:33:48 11  many employees?
13:33:48 12  A.  I believe there was probably, between
13:33:54 13  the two shifts, maybe 150 people in that job.
13:33:58 14  Q.  That you were responsible for as project
13:34:02 15  superintendent?
13:34:02 16  A.  Yes.
13:34:04 17  Q.  And with respect to your other functions
13:34:08 18  as project superintendent on the Lilly job, they
13:34:10 19  were more or less identical to your functions as
13:34:16 20  project superintendent on the Coors job?
13:34:18 21  A.  Yes.
13:34:18 22  Q.  And your project superintendent
13:34:20 23  functions on the GSK job were no different than
13:34:26 24  Lilly and Coors?
13:34:28 25  A.  Yes.

Page 123

13:34:28  1  Q.  And finally, the Biogen, I think Biogen
13:34:30  2  is the last one, again, same role, same
13:34:38  3  management function for the Biogen project as
13:34:40  4  Coors, Lilly, and GSK?
13:34:44  5  A.  Yes.
13:36:28  6  MR. CVITANOVIC:  I need to rearrange my
13:36:28  7  piles a little bit.  Why don't we take a
13:36:34  8  15-minute break.
13:36:34  9  THE VIDEOGRAPHER:  The time is 1:36 and
13:36:36 10  we're off the record.
13:36:38 11  (Recess taken.)
14:06:02 12  THE VIDEOGRAPHER:  The time is 2:05 and
14:06:16 13  we're on the record.
14:07:18 14  MR. CVITANOVIC:  Next in order.
14:07:18 15  (Exhibit 12 marked.)
14:07:18 16  Q.  (BY MR. CVITANOVIC)  Let me know when
14:07:18 17  you're ready.
14:07:34 18  A.  (Reviewing document.)  Ready.
14:07:34 19  Q.  Exhibit 12, well, it starts on the
14:07:38 20  second page where Alexa is asking you about an
14:07:44 21  agreement for Stew McDaniel on the vacation and
14:07:48 22  then you respond:  One week.  And then Alexa asks
14:07:54 23  you:  "What is your agreement?"  Which brings us
14:07:58 24  to your response Friday, May 4th, 2007 at 4:20 in
14:08:04 25  the afternoon.

Page 124

14:08:06  1  Will you take a look at this, please.
14:08:08  2  A.  Yes.
14:08:08  3  Q.  And you wrote that response?
14:08:10  4  A.  Yes.
14:08:12  5  Q.  And you are referring to your job duties
14:08:16  6  at the time and also the employee handbook and
14:08:24  7  vacation policy; correct?
14:08:24  8  A.  My interpretation when I had written
14:08:30  9  this was per the employee handbook which defined
14:08:32 10  four weeks a year, not related to policy or
14:08:38 11  maximum banked hours, because I wasn't aware that
14:08:44 12  there was an expiration of vacation.
14:08:48 13  Q.  Well, it's in the employee handbook, is
14:08:50 14  it not?
14:08:50 15  A.  I haven't seen the employee handbook.
14:08:54 16  Q.  And you're stating your acceptance to
14:08:58 17  those terms without reservation.  Are you stating
14:09:02 18  any reservation at all?
14:09:04 19  A.  Well, I say handbook definitions or four
14:09:08 20  weeks per year.
14:09:10 21  Q.  And Kinetic's vacation policy is based
14:09:18 22  on terms of service?
14:09:18 23  A.  Yes.
14:09:20 24  Q.  Length of service, I should say.
14:09:22 25  A.  Yes.

Page 125

14:09:22  1  Q.  And your length of service entitled you
14:09:24  2  to that four weeks.
14:09:24  3  A.  Per year.
14:09:26  4  Q.  Per year.
14:09:26  5  A.  Yes.
14:09:26  6  Q.  With a max, which you subsequently
14:09:30  7  learned, with a max accrual of two times annual?
14:09:34  8  A.  I learned at the time from Alexa when I
14:09:38  9  was stating that I was owed this many hours of
14:09:44 10  vacation.
14:09:46 11  Q.  Are you saying that the max accrual
14:09:46 12  shouldn't apply to you because you were unaware
14:09:48 13  of it; is that what you're saying?
14:09:50 14  A.  No.  Because the employee handbook is
14:09:54 15  associated with the exempt employees and I was
14:09:58 16  classified as nonexempt.  Whereas in the offer
14:10:02 17  letter stated four weeks a year and it didn't
14:10:06 18  define anything associated with employee handbook
14:10:10 19  or maximum.
14:10:14 20  MR. CVITANOVIC:  Well, I have an e-mail
14:10:14 21  here from you to Sandra Kellam saying that you
14:10:22 22  are an exempt employee in your own words.  Take a
14:10:26 23  look at it.  Exhibit 13.
14:10:28 24  (Exhibit 13 marked.)
14:10:30 25  THE WITNESS:  Okay.

(208)345-9611    M & M COURT REPORTING (208)345-8800 (fax)

b080e889-f0e3-4773-aac9-16a448e45d2e

Page 126

```
14:10:40  1        (Reviewing document.)  Okay.
14:10:42  2        Q.  (BY MR. CVITANOVIC)  You wrote those
14:10:46  3   words, that you were an exempt employee; is that
14:10:50  4   right?
14:10:50  5        A.  I was considered as exempt per Bob
14:10:54  6   Portman and Alexa.
14:10:56  7        Q.  Well, so you are saying that KSI
14:11:04  8   considers you exempt, but you didn't consider
14:11:08  9   yourself exempt?
14:11:08 10        A.  Correct.
14:11:10 11        Q.  But you didn't say that in here.
14:11:12 12        A.  Okay.
14:11:12 13        Q.  Why didn't you say I disagree with that?
14:11:20 14        A.  Well --
14:11:30 15        MR. OVERSON:  I'm sorry, I think I need
14:11:32 16   to object on here.  Are you representing this
14:11:52 17   time card was attached to this e-mail?
14:12:00 18        MR. CVITANOVIC:  Yes, I am.
14:12:08 19        MR. OVERSON:  I think -- can I have the
14:12:10 20   question read back?
14:12:32 21        (Record read back.)
14:12:32 22        MR. OVERSON:  I'm going to object to the
14:12:34 23   form of the question; I think it mischaracterizes
14:12:38 24   what he does say in this and the e-mail speaks
14:12:44 25   for itself.
```

Page 127

```
14:12:44  1        So go ahead.
14:12:46  2        Q.  (BY MR. CVITANOVIC)  So you're saying
14:12:46  3   that when it says "I am considered exempt," what
14:12:50  4   it really means to say is that Bob Portman
14:12:54  5   considers me exempt and I don't agree with that,
14:12:56  6   but anyway, "make sure I am not charged tax for
14:13:02  7   use of the vehicle for Saturday and Sunday";
14:13:06  8   that's what it really should read?
14:13:10  9        A.  I'd have to look at that time card and
14:13:14 10   see what that job was being reflected for,
14:13:18 11   because there was a vehicle that was issued to me
14:13:26 12   and I think that time card prior, I don't know if
14:13:30 13   it identified Saturday and Sunday on it, but I
14:13:34 14   wasn't working as a labor manager, so don't tax
14:13:36 15   me for the truck for Saturday and Sunday.
14:13:44 16        MR. CVITANOVIC:  Do you have the time
14:13:44 17   card on that?
14:13:46 18        MR. OVERSON:  No.
14:13:46 19        Q.  (BY MR. CVITANOVIC)  There's the time
14:13:48 20   card.  Let's compare that to the March 23, 2008
14:13:58 21   time card that you submitted with overtime.  It's
14:14:30 22   going to be Exhibit 8.
14:15:14 23        A.  On the original time card probably had
14:15:18 24   Saturday and Sunday for the truck; correct?
14:15:24 25        Q.  I don't know that to be the case.  I'm
```

Page 128

```
14:15:26  1   looking at the time card you submitted with
14:15:30  2   Exhibit 13.
14:15:30  3        A.  Yeah, with the overtime.
14:15:32  4        Q.  With the time card that you submitted
14:15:36  5   with the overtime.
14:15:44  6        A.  Okay.  This, I believe, was the week
14:15:48  7   that I submitted overtime to Sandra and it was
14:15:54  8   rejected because I got an e-mail from Bob Portman
14:15:58  9   that stated that I was exempt, not eligible for
14:16:02 10   overtime.  And that is when I said well, if you
14:16:06 11   are not going to pay me for overtime, then why
14:16:14 12   are you going to tax me on the truck?
14:16:14 13        Q.  Then when Bob sent that e-mail saying
14:16:18 14   you were exempt and not qualified for overtime,
14:16:22 15   you just let that stand, you didn't respond to
14:16:26 16   that?
14:16:26 17        A.  No, I didn't let that stand.  That's
14:16:30 18   when Bob and I got in several heated discussions
14:16:34 19   over the phone.
14:16:36 20        Q.  None of which were confirmed in writing
14:16:38 21   on your side; is that right?
14:16:40 22        A.  Nothing other than the e-mail that I got
14:16:42 23   from Bob Portman stating that I was exempt and
14:16:44 24   not eligible for overtime.
14:16:46 25        Q.  Your response to that was to call him?
```

Page 129

```
14:16:52  1        A.  Yes.
14:16:52  2        Q.  When did you call him in relationship to
14:16:58  3   that e-mail?
14:17:00  4        A.  Probably that same day.
14:17:02  5        Q.  Bob was assigned to the Coors project
14:17:10  6   also; right?
14:17:12  7        A.  For the beginning, yes.
14:17:12  8        Q.  Was he there?
14:17:14  9        A.  Yes.
14:17:14 10        Q.  When you were at the Lilly project in
14:17:26 11   Puerto Rico, you're claiming you were the
14:17:32 12   superintendent there; right?
14:17:32 13        A.  Yes.
14:17:34 14        Q.  But would you also continue to do your
14:17:38 15   labor manager duties while you were
14:17:42 16   superintendent in Puerto Rico?
14:17:44 17        A.  When I was tied up with those projects
14:17:46 18   in the situation that they were and as busy and
14:17:52 19   demanding as they were, I was neglecting my labor
14:17:56 20   manager's responsibilities.
14:18:00 21        Q.  But you continued to receive the
14:18:00 22   full pay as labor manager?
14:18:02 23        A.  My wages did not change.
14:18:06 24        Q.  And as neglected as your labor manager
14:18:10 25   duties were, you still continued to do them,
```

33 (Pages 126 to 129)

b080e889-f0e3-4773-aac9-16a448e45d2e

Page 146

```
14:43:38  1   other documents that concerned and governed your
14:43:44  2   employment at Kinetic Systems, weren't there?
14:43:46  3       A.  I'm not aware of any.
14:43:52  4       Q.  You were an employee of Kinetic Systems,
14:43:56  5   were you not?
14:43:56  6       A.  Yes.
14:43:56  7       Q.  You still had to function within the
14:44:00  8   four corners of the employee handbook, didn't
14:44:02  9   you?
14:44:02 10       A.  I was never supplied with the employee
14:44:06 11   handbook that was identified for exempt
14:44:08 12   employees, not nonexempt.  Kinetics doesn't
14:44:12 13   supply that employee handbook to all union labor
14:44:18 14   individuals that are hired.
14:44:18 15       Q.  So you're saying that you -- that the
14:44:20 16   employee handbook did not apply to you?
14:44:22 17       A.  My interpretation is it didn't.
14:44:24 18       Q.  And that the vacation policy didn't
14:44:26 19   apply to you?
14:44:28 20       A.  The vacation that I interpreted was per
14:44:32 21   the offer letter verbiage that didn't identify
14:44:34 22   the employee handbook.
14:44:36 23       Q.  So whatever policy and procedure that
14:44:40 24   Kinetic Systems implemented over the years, you
14:44:42 25   could just shine, say look, it's not in my offer
```

Page 147

```
14:44:46  1   letter, it doesn't apply to me; is that what
14:44:48  2   you're saying?
14:44:48  3       MR. OVERSON:  The question is
14:44:50  4   argumentative.  Go ahead.
14:44:52  5       THE WITNESS:  My interpretation was the
14:44:54  6   way it was written in the offer letter.
14:44:58  7       Q.  (BY MR. CVITANOVIC)  The way it was
14:44:58  8   written in the offer letter.
14:45:00  9       A.  The terms of my employment of that
14:45:04 10   position was within the written -- the written
14:45:10 11   specifics within the offer letter.
14:45:14 12       Q.  With no other document is what you're
14:45:18 13   saying that applied to you as Ron Wood?
14:45:20 14       A.  There was no reference to other
14:45:22 15   documents.
14:45:26 16       Q.  And because there was no reference to
14:45:26 17   other documents, you believe they didn't apply to
14:45:28 18   you.
14:45:28 19       MR. OVERSON:  Asked and answered.  Go
14:45:30 20   ahead and answer.
14:45:30 21       THE WITNESS:  I understood if there
14:45:36 22   wasn't any specifics with any offer letter that
14:45:38 23   that offer letter stood as written.
14:45:42 24       Q.  (BY MR. CVITANOVIC)  Well, then was the
14:45:42 25   offer letter ever changed to say that you were
```

Page 148

```
14:45:46  1   working as a project superintendent and you were
14:45:52  2   entitled to overtime?  If you want to -- I mean,
14:45:52  3   that's what you're saying in this lawsuit, isn't
14:45:54  4   it, that you worked as a project superintendent
14:45:56  5   and entitled to overtime?
14:45:58  6       A.  Yes.
14:45:58  7       Q.  Was your offer letter ever changed to
14:46:02  8   say that?
14:46:04  9       A.  The offer letter didn't identify labor
14:46:08 10   manager in it either, but it identified not
14:46:10 11   exempt hourly employee.  But as a labor manager,
14:46:14 12   there were no demands to work overtime; on the
14:46:18 13   projects there were demands.
14:46:20 14       Q.  But there was no offer for you to work
14:46:24 15   as a project superintendent, was there?  What
14:46:28 16   offer letter -- what do you have that you could
14:46:30 17   show me a document with "Kinetic Systems" on it
14:46:34 18   saying I want you to work as a project
14:46:38 19   superintendent?
14:46:38 20       A.  In the offer letter, is that in your --
14:46:50 21       MR. OVERSON:  It's Exhibit 2, Ron.
14:46:54 22       THE WITNESS:  In the offer letter it
14:46:56 23   doesn't define labor manager.
14:47:00 24       Q.  (BY MR. CVITANOVIC)  You knew what you
14:47:02 25   were being hired to do, right, because you had
```

Page 149

```
14:47:04  1   your --
14:47:06  2       A.  There was an e-mail that identified if I
14:47:10  3   was going to work in the capacity of a labor
14:47:12  4   manager.
14:47:12  5       Q.  That is what you did.
14:47:14  6       A.  As a labor manager there is no demands
14:47:16  7   to work overtime like there is on a project as a
14:47:20  8   project superintendent from the construction
14:47:24  9   management demands.
14:47:26 10       Q.  So did the Kinetic Systems safety policy
14:47:32 11   apply to you?
14:47:34 12       A.  Yes.
14:47:36 13       Q.  Is it in your offer letter?
14:47:40 14       A.  No, but for every person that is hired
14:47:42 15   that is a laborer employee is trained in that
14:47:46 16   safety manual.
14:47:46 17       Q.  But it's not in your offer letter, so
14:47:50 18   why does it apply to you?
14:47:50 19       MR. OVERSON:  Argumentative.
14:47:54 20       THE WITNESS:  Because the people that
14:47:54 21   are hired on as labor employees are familiar with
14:47:58 22   that document and trained in that document.  The
14:48:02 23   employee handbook is not supplied to labor
14:48:04 24   employees or trained with the content within that
14:48:08 25   employee manual.
```

(208)345-9611     M & M COURT REPORTING (208)345-8800 (fax)

b080e889-f0e3-4773-aac9-16a448e45d2e

Page 194

16:50:08 1 shop, support them by contacting local unions and
16:50:14 2 having labor relations, not request specific
16:50:16 3 manpower, but maintaining cohesive relationship
16:50:22 4 with the company as -- and the project.
16:50:26 5      Q. So on the job descriptions where it said
16:50:28 6 the project superintendent reports to the labor
16:50:32 7 manager, I mean, are you the project
16:50:40 8 superintendent -- as labor manager, are you the
16:50:42 9 superintendent's superior or supervisor or boss
16:50:48 10 or how would you qualify that?
16:50:50 11      A. Well, to be specific about it, I mean,
16:50:58 12 the description within the responsibilities
16:51:02 13 identified reporting directly to the labor
16:51:04 14 manager, but it was well understood that the
16:51:08 15 superintendent under organizational charts
16:51:12 16 reported directly to the project manager for the
16:51:16 17 project site. But whenever it came time that a
16:51:20 18 superintendent was to be reassigned to a
16:51:22 19 different project, then that would be my
16:51:28 20 responsibility through communication with the
16:51:32 21 branch manager, which is Bob Portman, and
16:51:36 22 operations manager and my involvement in the
16:51:40 23 estimates.
16:51:42 24      MR. CVITANOVIC: I have no more
16:51:44 25 questions for you.

Page 195

16:51:44 1      MR. OVERSON: I just have a couple of
16:51:46 2 clarifications. I think I got a little bit
16:51:50 3 confused along the way.
16:51:50 4
16:51:50 5      EXAMINATION
16:51:50 6 QUESTIONS BY MR. OVERSON:
16:51:54 7      Q. Exhibit 6, if you could pull that out.
16:52:10 8 I may have misheard you, I don't know. But of
16:52:14 9 those dates listed there, at what point did you
16:52:18 10 provide Portman with your time cards with the
16:52:22 11 overtime?
16:52:26 12      A. For Lilly? On 7/10.
16:52:30 13      Q. 7/10/07?
16:52:34 14      A. '07, that was his first availability.
16:52:36 15      Q. And then I think you said that that was
16:52:42 16 the only time you had submitted overtime cards?
16:52:44 17      A. Directly, yes. Yes, the rest of them
16:52:48 18 were verbal as far as the hours and that I felt
16:52:50 19 that I was due overtime. But due to what I went
16:52:54 20 through at Coors and not being compensated and
16:52:58 21 constantly talking with Bob Portman about Lilly
16:53:02 22 and the hours I was required to work, that I
16:53:06 23 documented and brought it back to him in the hard
16:53:08 24 copy.
16:53:08 25      Q. Did you ever e-mail a time card to human

Page 196

16:53:16 1 resources? I guess, let me just cut to the
16:53:20 2 chase. If you go to Exhibit 8.
16:53:24 3      A. Which one?
16:53:24 4      Q. Exhibit 8.
16:53:36 5      A. 8, okay.
16:53:36 6      Q. Go to, the Bates stamp is 168.
16:54:00 7      A. Okay.
16:54:00 8      Q. Take a look at that and the date.
16:54:06 9      A. Okay.
16:54:08 10      Q. Do you recall e-mailing that to somebody
16:54:12 11 at Kinetics?
16:54:14 12      A. Sandra Kellam.
16:54:16 13      Q. Sandra Kellam. When did you e-mail
16:54:18 14 that?
16:54:20 15      A. That would have been -- I'll tell you
16:54:32 16 specific here. That would have been per Exhibit
16:54:54 17 13 on March 21st.
16:55:00 18      Q. Okay. '08?
16:55:02 19      A. Yes.
16:55:02 20      Q. So that would, your other testimony then
16:55:10 21 would be incorrect, because in the sense that you
16:55:14 22 did provide a time card with overtime listed on
16:55:20 23 another occasion other than 7/10/07?
16:55:24 24      A. Yes.
16:55:24 25      Q. Okay.

Page 197

16:55:26 1      MR. CVITANOVIC: We don't disagree with
16:55:28 2 that.
16:55:28 3      MR. OVERSON: I didn't think you did. I
16:55:36 4 just wanted to make sure. I just wanted to make
16:55:36 5 sure it was clear for the record.
16:55:38 6      MR. CVITANOVIC: We are prepared to
16:55:42 7 concede there are three occasions or maybe even
16:55:46 8 four that it happened.
16:55:48 9      MR. OVERSON: Okay, I think with that
16:55:56 10 clarification I'm complete.
16:55:58 11      MR. CVITANOVIC: Okay, we're done.
16:56:00 12      THE VIDEOGRAPHER: The time is --
16:56:00 13      MR. OVERSON: We would like to review.
16:56:08 14      THE VIDEOGRAPHER: -- 4:56. This
16:56:10 15 concludes the deposition of Ronald Wood and we're
16:56:12 16 off the record.
16:56:12 17      (Deposition concluded at 4:56 p.m.)
16:56:12 18      (Signature requested.)
19
20
21
22
23
24
25

b080e889-f0e3-4773-aac9-16a448e45d2e

```
1                    REPORTER'S CERTIFICATE

2         I, BEVERLY A. BENJAMIN, CSR No. 710,

3    Certified Shorthand Reporter, certify:

4         That the foregoing proceedings were taken

5    before me at the time and place therein set

6    forth, at which time the witness was put under

7    oath by me;

8         That the testimony and all objections made

9    were recorded stenographically by me and

10   transcribed by me or under my direction;

11        That the foregoing is a true and correct

12   record of all testimony given, to the best of my

13   ability;

14        I further certify that I am not a relative

15   or employee of any attorney or party, nor am I

16   financially interested in the action.

17        IN WITNESS WHEREOF, I set my hand and seal

18   this  9   day of  July              ,  2010 .

19

20            Beverly A Benjamin

21   BEVERLY A. BENJAMIN, CSR, RPR

22   Notary Public

23   P.O. Box 2636

24   Boise, Idaho  83701-2636

25   My commission expires May 15, 2013
```

## Tom Land

**To:** Ron Wood
**Cc:** Kimberly Parry / Howard Shaw
**Subject:** National Microelectronics Construction Superintendent

Ron, This will confirm your new job assignment and terms and conditions of employment, effective this date.

1.) Your pay will remain the same as it currently is. You will be a salaried exempt employee. ( no overtime) You will not receive per diem. Your Union fringes will be forwarded to your home local union as has been previously done. Pay adjustments will be reviewed yearly in accordance with KSI policy and will not be based on increases negotiated by your home local union. A discretionary bonus will be determined by me based on the profitability of the microelectronics projects you involved with.

2.) Your vacation, holiday, and excused absences will be in accordance with KSI non union employees. ( vacation accrual based on length of employment as indicated in the KSI employee manual)

3.) You will _not_ be furnished with a KSI vehicle. You will be furnished with a KSI gasoline card to be used when on Company business. You will secure a rent car when you travel.

4.) All business travel will be paid for by KSI and all travel arrangements are to be arranged through Getz Travel. Please refer to KSI travel policy for meal and lodging reimbursement. Exceptions to the lodging policy may occur as determined by Getz Travel. All expenses incurred are to be itemized on an expense report form and forwarded directly to me for approval, even though you have a KSI Corporate American Express card in your possession. You will provide a one (1) month "look ahead" travel schedule for my approval, prior to incurring any expenses or booking any trips.

5.) You will work out of your residence in Idaho. You will be provided with a fax and computer by KSI.

6.) You will be responsible to participate in the bidding of Micro. work. You will be responsible to assist in the design, preconstruction activities, and planning of Microelectronics work. You will be responsible for the followup, monitoring, and proper closeout of Microelectronics work. You will be responsible for written recommendations to correct and overcome any and all field or admin. problems and the suggested implementation of corrective action for Project related _or_ Operations Division problems.

7.) You will be expected to provide a written report of your activities and recommendations to me a minimum of every other week.

8.) You will be _my_ direct liason and personal representative with both the Microkinetics personnel _and_ the KSI Ops. Mgrs. , Proj. Directors, Project Managers, Purchasing personnel, Admin, etc.

9.) You will be expected to act, dress, and conduct yourself in a professional manner, and as a gentleman as my personal representative.

Ron, I look forward to working with you. This should increase the operating efficiency and profitability of KSI by leaps and bounds. It's going to be fun.

J.T.Land
Executive Vice President
KSI Operations

1-19-98

Exh. No.
Date
Name 4/29/10
Wood
M & M Court Reporting

Page 1

J.T.Land
Executive Vice President
KSI Operations

1-19-98

**From:** Wood, Ron
**Sent:** Monday, October 06, 2003 3:56 AM
**To:** Durand, Chris
**Subject:** RE: Compensation

Chris,
I forgot to mention that when you receive this e-mail to give me a call on my cell and I will go over the specifics related to each line item so we both have a good understanding prior to negotiations.

RW

-----Original Message-----
**From:** Wood, Ron
**Sent:** Sunday, October 05, 2003 3:15 PM
**To:** Durand, Chris
**Subject:** Compensation

Chris,
Here is a list of compensation items which will cover the position of Labor Manager for the South East Jurisdiction and as required Regional support to the Eastern Region.

**Hourly / Salary**       $62.50 hr.       $130,000.00 Annual       (No Overtime)

**Per-Diem**       $1,800.00 Monthly (Personal Travel, 2 flights monthly @ $700 ea - Food allowance $400 Month)

**State Tax**       (set up for Idaho State since there will be considerable travel and also working from Idaho when there)

**Phone Bill**       (paid phone bill for separate line in Idaho to support faxes and communication while working in ID.)

**Accrued Vacation**  Based on 16 years of service with Kinetics

**Sick Pay**       Based on Kinetics Standard

**Paid Expenses**       While traveling outside of Durham for Kinetics

**Local 296 Fringes**  Paid on 2080 hours a year

**Paid Holidays**       Based on Kinetics established Holidays

**Communication**   Cell Phone and Blackberry (Bill covered by Kinetics)

**Housing & Utilities** As discussed previously while working in Durham (reimbursed Hotel costs when traveling)

**Transportation**       As discussed previously while working in Durham (reimbursed rental costs when traveling)

**Insurance**       Business Travel Accident Insurance and Term Life Insurance

**Stock Options**       As available

I believe this should about cover it. If you have any questions or need any clarification give me a call.

Thanks
RW

1



Exh. No. 3
Date 4/29/10
Name Wood
M & M Court Reporting

**Koontz, Alexa**

| | |
|---|---|
| **From:** | Wood, Ron |
| **Sent:** | Friday, May 04, 2007 4:20 PM |
| **To:** | Koontz, Alexa |
| **Subject:** | RE: Stew McDaniel |
| **Attachments:** | Signed Offer Letter Pg1.doc; Signed Offer Letter Pg2.doc; Signed Offer Letter Pg3.doc; 12-26-06 Rev 1.doc |

Alexa,

I have attached my signed agreement which entitles me Vacation, Holiday, and Sick Pay per the Kinetics Employee Handbook definitions or 4 weeks per year which I have seldom had the chance to take anyway. I also do not receive overtime and am based on 40 hour weeks.

I have also attached the breakdown that I had done for you and Sandra the end of last year which shows what the various key union employee's are entitled to for Holidays, and Vacation. Each of these employee's also receive overtime on the projects they are working which is the reason their paid Vacation is not per the Kinetics Employee Handbook.

Let me know if you need anything else.

RW

**From:** Koontz, Alexa
**Sent:** Friday, May 04, 2007 4:03 PM
**To:** Wood, Ron
**Subject:** RE: Stew McDaniel

What is your agreement?

Alexa Koontz, SPHR
Sr. Director of Human Resources and Benefits
Kinetic Systems, Inc
4226 Surles Court, Ste 500
Durham, NC 27703
P: 919-474-4654
F: 919-474-8440
M: 919-949-5266

**From:** Wood, Ron
**Sent:** Friday, May 04, 2007 4:02 PM
**To:** Koontz, Alexa
**Subject:** RE: Stew McDaniel

Exh. No. 17
Date 4/29/10
Name Wood
M & M Court Reporting

KSI 00053

1

1 week.

RW

**From:** Koontz, Alexa
**Sent:** Friday, May 04, 2007 3:55 PM
**To:** Wood, Ron
**Subject:** Stew McDaniel

What is the agreement on his vacation? How much per year?

Alexa Koontz, SPHR
Sr. Director of Human Resources and Benefits
Kinetic Systems, Inc
4226 Surles Court, Ste 500
Durham, NC 27703
P: 919-474-4554
F: 919-474-8440
M: 919-949-5266

2

KSI 0095-4